Katherine **CUNNINGHAM**

v.

The **UNITED STATES.**

No. 433–60.

United States Court of Claims.

Jan. 26, 1977.

Katherine Cunningham, pro se.

R. W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, KUNZIG and BENNETT, Judges.

1. The court amended its opinion by order on September 25, 1970, in a manner not relevant here.

2. The trial judge's findings of fact, copies of which have been distributed to the parties, are

## OPINION

PER CURIAM.

In *Cunningham v. United States,* 423 F.2d 1379, 191 Ct.Cl. 471 (1970), this court *en banc* held that the plaintiff in this case had been illegally separated from her civilian position with the Air Force on June 12, 1959. The court ruled that she was entitled to back pay from the date of the wrongful severance to date of judgment, less applicable offsets. This ruling, of course, as in all such cases, implicitly mandated that she prove in a subsequent proceeding under Rule 131(c) that she was ready, willing, and able to perform the duties of her Air Force post at all times during the pay recovery period.[1] The proceeding to determine the amount of recovery was conducted in 1974. Plaintiff met her burden of proof and Trial Judge C. Murray Bernhardt determined the amount of back pay to which plaintiff was entitled from 1959 to July 25, 1970, in his opinion and findings filed February 10, 1976. The amount of recovery, less offsets, from July 25, 1970, to today's judgment was reserved for further proceedings under Rule 131(c). This case is now before the court on the exceptions and briefs of the parties to the trial judge's 1976 opinion. Upon consideration thereof, having heard oral argument, the court agrees with the trial judge's opinion and findings and adopts the same, with minor modifications, as the basis for its judgment in this case.[2] It is necessary, however, for the court to address one issue not raised before the trial judge.

On May 20, 1976, plaintiff moved for permission to make a "third amendment" to her original petition filed November 10, 1960. The amendment prayed, *inter alia,* for the reinstatement of plaintiff to her former Air Force position or to one of similar status.[3] The motion in support of the

not printed, however, as those essential to the decision appear in the opinion which follows.

3. We reject and do not discuss certain other relief requested in the amendment as it is concluded that such is inappropriate in connection

amendment recited that the amendment would alter the prayer for relief "in order that it may encompass issues developed and supported by evidence adduced by reason of the trial held under Rule 131(c)." In other words, the amendment was said to be one to conform the pleadings to the evidence. Rule 39(b) authorizes such an amendment "when issues not raised by the pleadings are tried by express or implied consent of the parties." Upon this representation, the court allowed the motion on June 4, 1976. Defendant did not oppose, in fact did not even respond to, plaintiff's motion to amend.

Although plaintiff's motion appeared on its face to fall under Rule 39(b), in truth the prayer for reinstatement as shown in the amendment itself did not relate to any matter developed at trial. The new prayer was, instead, a request for additional relief, first set forth some 4 years after this court was granted reinstatement authority, *see* Pub.L. 92–415, now codified as 28 U.S.C. § 1491 (Supp. V, 1975), and some 16 years after plaintiff began her proceeding in this court on November 10, 1960. As an amendment sought totally apart from developments in the proof, plaintiff's May 20 motion falls not under Rule 39(b), as her statement of reasons for the motion suggested, but under Rule 39(a). The amendment itself cites both Rules 39(a) and 39(b). The standards of neither rule, however, permit the motion to succeed. The June 4, 1976, allowance, issued on erroneous representations, must be treated as void and improvidently issued.

█ Rule 39(a) provides that, after the initial pleading period, "a party may amend his pleading (1) by leave of court (which shall be freely given when justice so requires), or (2) by written consent of the adverse party." Defendant has not consented in writing to plaintiff's amendment. The first standard therefore governs, requiring leave of court to amend the plead-

ings. The court's permission is to be given freely, according to the rule, but with the qualification that it is to be given freely "when justice so requires." The viability of plaintiffs May 20 motion rests squarely on whether justice requires that she be allowed to amend her pleadings in 1976 to add a prayer for reinstatement. Such a determination is left to the court's discretion. It is obvious to us that considerations of fairness and substantial justice to both parties not only do not require that permission to amend be given, but to the contrary counsel against allowance of the motion. Plaintiff has waited 16 years from the filing of her original petition in this court to ask for the remedy of reinstatement. She could have sought mandatory or declaratory relief in this vein from the United States District Court for the District of Columbia as early as mid-1959, *Levine v. Farley,* 70 App.D.C. 381, 107 F.2d 186 (1939), and from federal district courts sited elsewhere following enactment of 28 U.S.C. § 1361 (1970) in 1962. *See Chaudoin v. Atkinson,* 494 F.2d 1323 (3d Cir. 1974). She could have requested reinstatement from this court beginning in late 1972, after the enactment of Pub.L. 92–415 on August 29, 1972. Plaintiff never sought to invoke the district court's aid, however, and delayed submitting her prayer to this court until 4 months after the filing of the trial judge's opinion in February of 1976. Interestingly, plaintiff's motion to amend arose only after the trial judge observed in his opinion, printed *infra,* that "[t]here is no express prayer for reinstatement."

At oral argument, plaintiff was questioned by the court regarding this delay. She responded that she did not know that a request for reinstatement should have been made prior to the time that she convinced the court—presumably meaning the trial judge—that she was entitled to full back pay to the present date. Ignorance of rights and procedural rules may sometimes be forgiven a *pro se* claimant, as plaintiff now is, but other facts reveal her explana-

---

with this claim for back pay and, in any event, the amendment is voided for reasons which follow. It is noted that plaintiff has incorrectly captioned her motion and amendment as the

third amendment. The plaintiff's amendments to her petition are as follows: (1) Mar. 6, 1961; (2) Nov. 23, 1965; (3) Jan. 16, 1974; and (4) June 4, 1976.

tion of delay to be merely a lame excuse. Although plaintiff is presently conducting her case alone, she has had the assistance of four legal counsel at various times during the odyssey of her case. Since filing her petition she has worked as a legal secretary for four large law firms and is not unacquainted with law and lawyers and how to get legal advice. The trial judge describes plaintiff as "exceptionally intelligent." Further, when the court first received authority from Congress to order reinstatement, the clerk of the court sent written notice of this development to all claimants with cases then pending in the court, including of course the present plaintiff. The notice sent forth, styled "General Order No. 3 of 1972," 200 Ct.Cl. xxvii, dated December 12, 1972, recited that "[a]ny party may request that the court issue * * * an order directing restoration to office or position * * *," that "[i]n any case pending on the date of this order in which [such] relief * * * is sought, the nature of the order desired shall be specified in such pleading as may be allowed in accordance with the provisions of Rule 39," and that "any request for [such] relief * * * shall be made at the earliest practicable opportunity." Plaintiff was thus on written notice that she could and should promptly amend her pleadings under Rule 39 to ask for reinstatement. Plaintiff's delay of 3½ years after notice, in seeking reinstatement from this court, and her much greater delay in seeking help from the district court remain unexplained and unexcused. Her May 20 motion smacks of afterthought, and justice does not require that it be allowed. Plaintiff has had quite long enough to formulate in her own mind the relief that she wants from this court. Her amendment praying for reinstatement is tardy beyond belief, and cannot now be permitted.

Since we have decided to read the pleadings absent the amendment requesting reinstatement, and since no findings were requested or made about it or proof adduced thereon which might justify amending the petition to conform to the evidence, nor does justice require it, no relief will be forthcoming beyond the payment of sums that have been or will be found properly owing in proceedings under Rule 131(c) to date of this judgment.

## OPINION OF THE TRIAL JUDGE

BERNHARDT, Trial Judge:

In April 1970 it was determined that plaintiff was entitled to judgment of back pay for procedurally improper separation in 1959 from her civilian position in the Air Force. 423 F.2d 1379, 191 Ct.Cl. 471 (1970). The amount of recovery was remanded to the trial division for ascertainment. The Comptroller General has computed, without dispute, the amount of back pay due plaintiff to July 25, 1970, and the deductions therefrom for lump sum terminal leave payment, contributions to the Civil Service Retirement Fund, and premiums for Federal Government Life Insurance. Disputed issues remaining include principally the following: (1) whether plaintiff has been ready, willing and able to work since 1959; (2) whether her failure to seek or obtain employment from 1967 to date so as to mitigate damages was justified; (3) whether the 100-percent disability compensation she has received from the Veterans Administration (hereafter VA) from 1959 to date should be credited against her recovery. In addition, plaintiff wants the court to repudiate and declare invalid various diagnoses of mental illness by the Army in 1945 and by the VA from 1954 to 1970, upon which later her 100-percent disability compensation rating is predicated.

So that these issues might be considered in their proper context, highlights of the record are summarized, starting with plaintiff's service in the Army where for present purposes her official medical history in the Government originated:

*1944–45*: Served as private in Women's Army Corps from August 7, 1944 to April 30, 1945. Hospitalized at three successive Army hospitals from February until April 30, 1945, with initial complaint of pneumonia. Honorably—albeit involuntarily—discharged on April 30, 1945, on a Certificate

of Disability for psychoneurosis classified as "anxiety hysteria, severe", having been admitted to the last hospital for psychosis, schizophrenic reaction type, but not found to be psychotic. Plaintiff's challenge of the discharge on factual and legal bases is now pending before the Army Correction Board for determination, but suspended there awaiting disposition of the instant case.

*1945–48*: Original rating of 30-percent disability by VA for service aggravation of "psychoneurosis, anxiety, considerable social and industrial incapacity", reversed on appeal because condition of "psychoneurosis, mixed type" was found to have preexisted service and was not service aggravated, but ultimately reinstated by VA Board of Veterans Appeals July 30, 1948, with rating reduced to 10 percent from August 30, 1946, for service aggravated "psychoneurosis, mixed type."

*May 1973—August 1954*: Continuously employed, except for brief periods of unemployment 1945, 1947, and 1952, 8 months plus in Women's Army Corps 1944–45, and periods as student.

*August 1954—December 1954*: Employed by Boeing Airplane Company as mathematician. Leave of absence from Boeing on December 9, 1954, to enter VA hospital.

*December 1954—April 1956*: Three separate periods of hospitalization in VA hospital in Seattle, resulting in several "impressions" and/or "diagnoses" of "schizophrenic reaction, paranoid type", a psychosis as opposed to a psychoneurosis, the difference being a mental disease versus a behavioral problem. These impressions and/or diagnoses plaintiff challenges as factually and procedurally erroneous.

*May—June 1955*: In May 1955 VA proposed to end plaintiff's disability compensation because the true diagnosis was said to be a nonratable "inadequate personality" instead of the prior diagnosis of psychosis, which latter was recommended to be held erroneous. In June 1955 the VA Central Office disagreed with the recommendation, and diagnosed plaintiff instead as service-connected "conversion reaction", stated to be a character and behavior disorder and not a psychosis or a neurosis. VA Regional Office was accordingly instructed that plaintiff's service connection for neuropsychiatric disorder not be disturbed.

*September 1955*: Despite the instruction of the VA Central Office in June 1955 noted in the preceding paragraph, in September 1955 the plaintiff's VA disability rating was increased to 100 percent, effective retroactively to December 10, 1954, for a condition identified as "conversion reaction—now diagnosed schizophrenic reaction, paranoid type", a psychosis, on the basis of an April 1955 final diagnosis by the Seattle VA Hospital. The plaintiff contends, with considerable authority, that in changing the diagnosis the VA failed to comply with procedures for such a change which are made mandatory by certain VA regulations which she cites. Plaintiff has retained the 100-percent rating to date.

*June 1956*: Plaintiff's VA 100-percent rating confirmed and continued, based upon plaintiff's renewed hospitalization at Seattle VA Hospital, and resultant diagnosis. The official VA Central Office conflicting diagnosis in June 1955 referred to above was apparently ignored.

*July 1956—June 1959*: After medical clearance, and with full knowledge of her 100-percent VA disability rating, plaintiff was hired as a mathematician by the Wright Air Development Center (an Air Force installation) in July 1956 and remained there until June 1959, when her resignation was accepted despite her prompt retraction. This is the separation declared procedurally defective by the court in 1970.

*June 1958*: In June 1958, while plaintiff was employed as a mathematician at WADC, her VA rating of 100-percent disability for schizophrenia, paranoid type, was confirmed and continued, based upon a VA examination in May 1958. This diagnosis is also attacked by plaintiff as being factually and procedurally erroneous.

*1959–67*: After exhausting all possibilities of obtaining employment as a math-

ematician following separation from WADC in 1959, plaintiff was employed as a secretary in six successive offices in Washington, D.C.

*June 1967 to date:* Unemployed.

■ It is clearly the plaintiff's burden to prove that she was ready, willing and able to discharge the duties of the position from which she was illegally separated in 1959, before she can recover back pay. *Manzi v. United States,* 198 Ct.Cl. 489, 493 (1972); *Everett v. United States,* 340 F.2d 352, 169 Ct.Cl. 11 (1965); *Keith v. United States,* 174 Ct.Cl. 284, 290 (1966); *Seebach v. United States,* 182 Ct.Cl. 342, 353 (1968); *Urbina v. United States,* 428 F.2d 1280, 1287, 192 Ct.Cl. 875, 886 (1970); *Walker v. United States,* 179 Ct.Cl. 723 (1967), *cert. denied,* 389 U.S. 1036, 88 S.Ct. 772, 19 L.Ed.2d 825 (1968). The defendant contends that plaintiff's receipt of 100-percent disability compensation from the VA since prior to 1959 to this time automatically establishes that she was not able to discharge the duties of the position from which she was separated. The defendant also relies on the expert testimony of Dr. Russell Martin, a board-certified VA psychiatrist who, on the basis of his examination of plaintiff in December 1970, testified that she was unemployable in any capacity at that time because of her diagnosis of "paranoid schizophrenia, in remission." Plaintiff meets these contentions with the fact that she was employed almost continuously in a secretarial capacity from 1959 to 1967, and with the expert testimony of Mr. John H. Hoffman, a highly qualified clinical psychologist, who testified that plaintiff never suffered from either a psychosis or even a neurosis while she was employed as a Government mathematician at Wright Air Development Center (WADC) from 1956 to 1959, that there was no question of plaintiff's readiness, willingness and ability to discharge her duties as a mathematician at WADC despite the fact that throughout that period she was officially diagnosed as 100 percent mentally disabled by the VA for compensation purposes, and that from his observation of plaintiff's conduct of her own trial as a *pro se* plaintiff she was completely sane. We shall consider these various contentions in detail.

■ The VA informed the court by letter in 1973 that a disability rating assigned a veteran represents the average impairment of earning capacity which that disability would cause in civil occupations generally, and does not necessarily represent the reduction in earning capacity which a specific veteran may have suffered as the result of his disability. The VA advised that many veterans are able to overcome the handicap of their disability and earn substantial wages in private or Government employment while they continue to be paid disability compensation. Unlike 38 U.S.C. §§ 301 *et seq.* (1970), which does not by its terms preclude receipt of VA disability compensation by a veteran earning a salary for services rendered, by analogy section 7 of the Federal Employees' Compensation Act of 1916, *as amended,* 5 U.S.C. § 8116(a) (Supp. V, 1975), provides that recipients of disability pay under that Act may not receive salary, pay, or remunerations of any type from the United States for the same period except in return for services actually performed. The grant of total disability under FECA is premised on the agency's determination of the total and complete disability of the recipient to perform his normal work, so the claimant's receipt of total disability compensation under FECA automatically establishes his inability to work for the purpose of precluding his recovery of back pay for wrongful discharge, unless he can establish that the agency's determination of total disability was clearly wrong. *Graves v. United States,* 176 Ct.Cl. 68 (1966); *Everett v. United States, supra.* Obviously a finding of total disability by the VA does not have the same preclusive effect on recovery of back pay for wrongful discharge as a similar finding under FECA, primarily because of the terms of the latter. Defendant's premise that plaintiff's receipt of 100-percent disability compensation from VA establishes *ipso facto* her inability to work since 1959 is without merit.

We next consider the testimony of defendant's expert psychiatrist, Dr. Russell Martin. Dr. Martin personally examined plaintiff in December 1970 for approximately one hour, after a study of one hour or less of limited parts of plaintiff's voluminous medical record in the VA, arrived at the "impression" of "paranoid schizophrenia, in remission", and concluded that plaintiff's paranoid personality characteristics rendered her unemployable in any capacity at the time of the examination. He found no over psychosis present at that time, nor in fact since 1955, including the 3-year period of her employment by WADC from 1956 to 1959. Since he found plaintiff at the time of his examination to be alert, coherent, with clear train of thought, etc., his ultimate impression of psychosis was based entirely on five interim and final summaries by the Seattle VA Hospital in 1954 through 1956 (the only parts of the VA medical record he consulted), plus information supplied him by plaintiff concerning her erratic record of private employment from 1959 to 1967. Had he not known of plaintiff's VA medical history, but only of her private employment history following 1959, Dr. Martin said that he would have diagnosed her as "paranoid personality" rather than "paranoid schizophrenia, in remission." Had he known neither of plaintiff's medical record nor of her private employment history after 1959, he would have found nothing wrong with her on the basis of his examination in 1970. Dr. Martin found no active psychosis to exist when he examined plaintiff in 1970. In assessing plaintiff's record of frequent job changes from 1959 to 1967, Dr. Martin relied exclusively for his information on plaintiff's description of it to him, and did not refer the matter for investigation and report to the Social Work Service facility of the VA, as he could have done. Since the fault or reason for plaintiff's series of private job terminations after 1959 was indeterminate from the record, yet was so instrumental in Dr. Martin's diagnosis, it would have behooved Dr. Martin to have referred the matter to the Social Work Service of VA for investigation and report. Nor did Dr. Martin enlist the services of the VA Clinical Psychology Department for testing the presence of pathological symptoms in the plaintiff, as he could have done. While employing these available VA facilities is discretionary with the examining psychiatrist, in view of the extraordinary history of this litigation, it would have been the better part of discretion for Dr. Martin to have done so, particularly since his own examination was brief, and as persuasively presented by plaintiff the medical records upon which he relied were suspect in their validity and incomplete in their substance.

In challenging Dr. Martin's diagnosis plaintiff has gone to great lengths to itemize the respects in which Dr. Martin's diagnostic evaluation failed to comply with the requirements specified in the Physician's Guide, Disability Evaluation Examinations, published in June 1963 by the VA Department of Medicine and Surgery for the information and guidance of physicians performing examinations for VA compensation, pension, and insurance purposes. For these reasons, although Dr. Martin was well-qualified to assess plaintiff's mental condition with respect to her employability since 1959, it is not believed that he devoted the time or engaged the available VA resources sufficiently to justify complete reliance on his professional judgment in this instance.

In direct contradiction to the views of defendant's Dr. Martin is the testimony of Mr. John H. Hoffman, who for the entire period of plaintiff's employment at WADC from 1956 to 1959, and for many years preceding and following that chapter of this record, was a certified clinical psychologist serving as the Chief of the Mental Hygiene Section, Federal Civilian Employees Health Service Branch at WADC. In this capacity Mr. Hoffman was consultant in psychology to the medical member of the Board of United States Civil Service Examiners for the Civil Service Commission facility at WADC. With full knowledge of plaintiff's medical history in the Army and VA, Mr. Hoffman, after examining her on the basis of clinical psychological tests which he con-

ducted, passed upon the psychological aspects of her application for employment by WADC, and certified that she was psychologically capable of discharging her prospective duties as a mathematician at WADC. In this connection he was familiar with Sec. 5–2a of Subchapter 5, Federal Personnel Manual, which provides that "as a general rule, a history of mental illness is not disqualifying for Federal employment provided that recovery has been certified by competent medical authority and the applicants are capable of performing the duties of the position without hazard to themselves or others."

During the plaintiff's first probationary year of employment at WADC, Mr. Hoffman received periodic reports from plaintiff's supervisors which were entirely favorable to her, with no derogatory information whatsoever. These favorable reports were corroborated by the plaintiff's periodic efficiency reports which were uniformly "satisfactory." This record of official satisfaction with plaintiff's performance at WADC is diametrically inconsistent with other evidence from plaintiff's superiors, portraying plaintiff as a constant trouble-maker who caused repeated management disruptions by her charges of discrimination, and who was moved from job to job. If these latter facts were true it is remarkable that they were not brought to the attention óf Mr. Hoffman. Despite the contradictions, it is concluded that the *official* record does not establish that plaintiff was not mentally or technically qualified to perform her duties as a mathematician during her 3 years at WADC. In fact, Mr. Hoffman testified that even if the derogatory record of plaintiff's employment at WADC as reported by her superiors was correct it would not alter his conclusion that plaintiff was suffering from neither a psychosis nor a neurosis. He diagnosed plaintiff at the outset of her employment at WADC as "psychoneurosis, mixed, chronic, mild" (a relatively mild form of behavior disturbance), but he later found that even this diagnosis was not appropriate and could not be sustained. It was his belief that it would be difficult for a person burdened with a diagnosis of schiz-

ophrenia reaction, paranoid type, known to others, to lead a life with normal relationships, particularly in the area of employment. Nor would he be surprised that plaintiff, having been denied employment in her field of mathematics because of her VA diagnosis of psychosis (as she was denied on numerous occasions in seeking jobs in that field) would have her record of going from one secretarial job to another from 1959 to 1967.

The court has had at least two occasions to consider the effect of a mental disability diagnosis on an individual's chances of securing employment. In *Scroggins v. United States,* 397 F.2d 295, 184 Ct.Cl. 530, *cert. denied,* 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968), the majority rejected plaintiff's contention that a disability retirement for psychiatric reasons is a "badge of infamy." However, Judge Skelton's concurrence, 397 F.2d at 302, 184 Ct.Cl. at 541 stated that such a retirement creates a stigma against the employee "that can never be outgrown nor overcome", and "[c]ertainly no government agency would likely hire an employee who had been so retired, and it is unlikely any other employer with desirable employment would do so." In *Davis v. United States,* 181 Ct.Cl. 1095 (1967), the court said in the findings at 1124 that plaintiff's efforts to improve his post-discharge job status by seeking employment elsewhere "were frustrated (1) by his history of mental illness and (2) by his consequent inability to obtain clearance for secret work." If the "cloud of her discharge [for glaucoma] * * * thwarted" plaintiff at every turn in her effort to get work during a period of unlawful separation, as in *Keith v. United States, supra,* a diagnosis of insanity constitutes a much more insuperable obstacle, no matter how long it may have been in remission. A leading psychiatric authority, Dr. Karl Menninger, in a paper entitled "The Unitary Concept of Mental Illness" published in The Bulletin of the Menninger Clinic, stated that the "word schizophrenia becomes a damning designation. To have it once applied to a young man can be to ruin a career, despite all evidence of subsequent healthiness."

Certainly the plaintiff found that her VA diagnosis of mental illness emphatically impeded her efforts to secure a job as a mathematician. Immediately after her VA diagnosis in 1955 plaintiff filed many applications with American companies for employment as a mathematician, and despite her good technical credentials, a shortage of mathematicians, and initially favorable reception of her applications, she was unable to secure a job once the prospective employer learned of her readily available medical history. Eventually she was hired by WADC in 1956 as previously stated after being cleared by Mr. Hoffman, their clinical psychologist. During her employment at WADC she made at least four applications for employment as a mathematician to research organizations in the Navy and Air Force, with no results, more than likely due to their ready access to her medical history. Following plaintiff's separation from WADC in 1959 she again filed numerous applications for employment as a mathematician with defense type corporations, some of which responded encouragingly until her medical background became known. In one case her hiring by General Motors Corporation was rescinded when they apparently learned of her mental illness. In desperation she sought secretarial work through employment agencies, both public and private, and was not successful, including a rejection for secretarial employment by an Air Force base in Ohio.

Finally, plaintiff came to Washington, D.C., to seek a secretarial job, and from December 1, 1959 to June 1967 held a series of six secretarial jobs, usually in law firms. In this 8–year period of 1959–67 plaintiff was unemployed for a total of approximately 11 months between jobs. About half of her 8 years of private employment was with one employer, which was the only one where no questionable circumstances attended her departure. In each of the others some incident involving a clash of personalities precipitated her resignation or discharge. The facts of record are insufficient to establish the justification for her terminations. There were no complaints concerning her tech l capacity, for plain-

tiff is an exceptionally intelligent person. She feels that her terminations were due to knowledge gained by her employers of her medical history, but proof leaves this assumption speculative.

To the defendant this record of plaintiff's private employment from 1959 to 1967 proves that she was unemployable, in that she was unable to hold a job. To the plaintiff her employment during that time proves just the contrary, that she was able to work, and the fact that she was unable to find work comparable to the position from which she was discharged cannot be held against her, for her medical record prevented it. In *Manzi v. United States, supra,* the court held at 493 that the claimant must show "that he was ready, willing and able to perform the duties of the position from which he was removed for the period for which he seeks recovery." As long ago as *Nicholas v. United States,* 53 Ct.Cl. 463 (1918), *aff'd,* 257 U.S. 71, 42 S.Ct. 7, 66 L.Ed. 133 (1921), it was held that a claimant must "show affirmatively his willingness and ability to discharge the duties of the office in question from the date of his removal down to the present time." However, in *Keith v. United States, supra,* it was stated at 290 that, if the plaintiff is able to work but cannot get work due to no fault of her own, she has met her burden of proof. As a logical extension, if a person who is illegally separated from her Government job was able to discharge the duties of the position from which she was separated at the time of the separation, and if thereafter she tries diligently but without success to obtain employment of that character due to circumstances for which the Government itself is in part responsible, then she has met the burden of proving that she was ready, willing, and able to work. It is not known whether at this late date the plaintiff retains the knowledge and mathematical skills requisite to discharging her former duties at WADC, but if not this circumstance cannot properly be held against her.

In the *Keith* case, *supra,* where the defendant failed to show that plaintiff was physically unable to perform her duties in

the period between her improper discharge and her reinstatement for which she sought recovery, in commenting on the plaintiff's ability to work, the court said at 289 of the opinion that the "fact is that she has shown [by performance of duties following reinstatement] that those disabilities, such as they are, do not prevent her working." Similarly in plaintiff's situation, the fact that she was gainfully employed as a secretary from 1959 to 1967 demonstrates that she was able to work and support herself, albeit she did not work as a professional mathematician for reasons apart from her ability to do so if she could have found a job. "Ability to work" relates only to one's innate physical or mental capacity, and not to the circumstance of whether a job is available.

Summing up, the plaintiff's record of almost constant employment from 1956 to 1967 as a mathematician at WADC for 3 years, and as a legal secretary thereafter, during all of which period she was drawing 100-percent VA disability compensation based on a diagnosis of psychosis, plus the fact that whatever mental condition she had has been inactive and in remission for over 20 years, the conflicting views of Dr. Martin and Mr. Hoffman as to her employability, the substantial conflicts in her diagnoses within the VA itself, the serious questions which exist as to the regularity of the diagnoses of mental incompetence by the VA, and the able manner in which the plaintiff has represented herself in this complex case ever since its inception in 1960, lead to the unavoidable conclusion that from her separation at WADC in June 1959 to her last employment in June 1967 the plaintiff has shown herself to be ready, willing, and able to work in some gainful occupation. Since her ability to perform duties as a mathematician at WADC existed at the time of her separation therefrom, there is a presumption in the absence of evidence to the contrary that those abilities remain, diminished though they may be through a desuetude not fairly chargeable to plaintiff.

From 1967 to the rendition of this court's opinion on the liability issue in April 1970 the plaintiff's time was occupied with the preparation of requested findings and briefs following a trial in March 1967, preparation of brief and exceptions to the report of the trial judge, several discovery motions, and a motion for summary judgment which was allowed. From April 1970 to date the plaintiff's time has been fully consumed in the preparation of literally dozens of discovery motions, pretrial conferences, preparation for trial, trial in June 1974, and preparation of voluminous requested findings and briefs. The Government, which steadfastly resisted plaintiff's efforts for many years to gain access to all of her medical records on the grounds that their production would be injurious to her mental health, finally gave in after the court granted a series of plaintiff's discovery motions in 1970 and 1971, and thereafter reluctantly capitulated in meeting plaintiff's numerous demands for additional records which had not hitherto been produced, to the end that at this time it is safe to say that the Government has furnished plaintiff all of the records which it has been able to find. Incidentally, their disclosure to plaintiff has not had any deleterious consequences to her health as the Government had feared, so far as is known.

All of this has taken an enormous amount of plaintiff's time. One need only examine the many pages of the court's docket book to appreciate the extent of plaintiff's personal involvement. While for certain periods she was represented by counsel of record, there is reason to believe that plaintiff herself was responsible for virtually all of the paperwork, research, legal strategy, discovery, and presentation at trial. It is questionable whether plaintiff, even if financially able to do so, could have found counsel willing or able to spend the time required to duplicate her own efforts. It is true that much of the effort has been expended unproductively in connection with the elaborate reconstruction of her records in the Army and VA in order to expunge or edit them, but as a nonlawyer the plaintiff cannot be expected to exercise legal dis-

cernment as to relevant evidence, to fully comprehend jurisdictional limits, or to conduct her litigation as efficiently as one trained in the law.

In *Urbina v. United States, supra,* it was said 428 F.2d at 1287, 192 Ct.Cl. at 886 of the opinion: "An illegally discharged employee will not be denied his back salary for failure to work during periods when his time is reasonably consumed in prosecuting appeals from such discharge." In *Schwartz v. United States,* 181 F.Supp. 408, 149 Ct.Cl. 145 (1960), during the period from plaintiff's suspension and subsequent reinstatement plaintiff admittedly made no effort to secure employment. The court excused him from his failure while he was preparing for his administrative hearing following his suspension and while he was awaiting a decision on his appeal, but not thereafter. It is abundantly clear in the case under consideration that plaintiff was, in fact, fully occupied in the prosecution of her case in this court at least since June 1967. Had she been employed since 1967 she would have been physically unable to perform all the duties the case has entailed. Therefore, from June 1967 to the present time she is entitled to the back pay for the position from which she was separated, and is exempt from the normal requirement of mitigating damages by seeking gainful employment in that period because she has proven that her time was reasonably consumed in prosecuting her case.

Paradoxically, the plaintiff objected to the judgment awarded her by the court in 1970 on the issue of liability because at all times an award of back pay for illegal separation has been distinctly subordinate in her wants. Her overriding goal in this litigation is and always has been to secure an official pronouncement by the court that the series of Army and VA mental diagnoses from 1945 to 1955 were invalid. She is particularly concerned over the subsisting VA diagnosis of "schizophrenic reaction, paranoid type", a pathological psychosis—in short, insanity—because it has permanently blighted her professional career as a mathematician and has made her a social outcast. If in fact the plaintiff was wronged in these diagnoses we can only sympathize with her plight, but even so would be powerless to render the relief she demands, for the power to correct lies only in the source, namely, the Army and the VA.

To this end there is pending before the Army Board for Correction of Military Records plaintiff's application filed in January 1973, demanding that her Army medical, service, and discharge records be corrected to eliminate all references and findings as to her mental or emotional condition on the grounds of factual and procedural errors. The Board proceeding has been suspending awaiting the conclusion in this case. The authority of the Board derives from 10 U.S.C. § 1552 (1970), as implemented by regulations, 32 C.F.R. § 581.3 (1976), under which the Secretary of the Army, acting through a board of appointed civilians, may correct any Army military record when necessary "to correct an error or remove an injustice." The scope of authority is broad. It does not, of course, embrace the correction of VA records. There is no express sanction against judicial review. Although resort to the Board has been considered to be a permissive rather than a mandatory remedy so that it does not toll the running of the statute of limitations from first accrual of the cause of action (*O'Callahan v. United States,* 451 F.2d 1390, 196 Ct.Cl. 556 (1971); *Rynerson v. United States,* 202 Ct.Cl. 1095 (1973), *cert. denied,* 415 U.S. 995, 94 S.Ct. 1598, 39 L.Ed.2d 892 (1974); *Artis v. United States,* 506 F.2d 1387, 205 Ct.Cl. 732 (1974)), there are circumstances where recourse to the Board becomes a mandatory remedy which must be exhausted before judicial review is available. *Friedman v. United States,* 310 F.2d 381, 392–93, 159 Ct.Cl. 1, 18–19 (1962), *cert. denied, sub nom. Lipp v. United States,* 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963). This is such a case. At this stage the Board is the only remedy open to plaintiff for the purpose she seeks, namely, to correct her military records, and must be exhausted before this or any court

can review the procedural regularity of final Army action. Even then the scope of review would be limited to the procedural regularity of the Board proceeding, rather than correction of actions which are purely within the discretionary prerogative of the Army. For the benefit of the Board it can be said that our careful review of the wealth of exhibits and regulations in the context of plaintiff's extensive findings and briefs justifies the conclusion that the plaintiff's contentions are not frivolous.

■■■■ The plaintiff's demand that the court revise and correct the VA diagnosis of her mental condition because of factual and procedural errors and violations is completely beyond our jurisdiction. The statute, 38 U.S.C. § 211(a) (1970), makes decisions of the VA on any question of law or fact concerning a claim for benefits or payments final and conclusive and not subject to judicial review, with certain exceptions not here pertinent. Veterans' benefits are considered to be gratuities, and establish no vested rights in the recipients, so that Congress is not obligated to provide a remedy through the courts but may provide only an administrative remedy. *Milliken v. Gleason*, 332 F.2d 122 (1st Cir. 1964), *cert. denied*, 379 U.S. 1002, 85 S.Ct. 723, 13 L.Ed.2d 703 (1965). The federal courts (*Brown v. United States*, 150 Ct.Cl. 836 (1960)) have overwhelmingly applied the statute to preclude review, almost always with reference to decisions of the VA on claims for disability compensation. The plaintiff's disability compensation is at the maximum of 100 percent, so her claim is not the usual one to award her compensation or to increase it, but by indirection to decrease or eliminate it if she were to succeed in her efforts to erase or modify the VA diagnosis of psychosis upon which her disability rating is predicated. This court has no jurisdiction to correct or change the VA diagnosis, no matter how erroneous it may have been; its sole jurisdiction is to render a money judgment. The money judgment sought here is for back pay for wrongful separation from plaintiff's civilian job in the Air Force. It is not for VA disability compensation, so even if the statute were not to preclude judicial review of VA decisions on a veteran's entitlement to disability compensation there would be no nexus upon which the court, in exercising its power to enter a money judgment, could implement that award by correcting the administrative record upon which the award of money judgment must rest, since the demand is not to alter the VA disability compensation.

We are uninformed by the record as to whether the VA has a formal procedure comparable to the Army's Correction Board designed to correct errors in past VA medical diagnoses, other than its duty to make periodic examinations of beneficiaries to adjust their disability rating according to fluctuating physical conditions. If the VA were to have such a procedure, certainly the record which the plaintiff has advanced to the court would justify a restudy in depth of plaintiff's contentions, for as in the case of the plaintiff's contentions concerning the correction of her Army record, her representations as to her VA diagnoses are not without prima facie appeal. In her insistence on the correction of her VA diagnoses—a demand we cannot redress—plaintiff places at serious risk the valuable disability compensation she has been receiving. Her quixotic compulsion to jeopardize that in exchange for a clean bill of health is beyond the writ of this court.

■■■■ As for the arithmetic of plaintiff's recovery, the following schedule reflects to and including July 25, 1970, and without consideration of tax liability, an amount due her of $57,182.75: [1]

1. From December 10, 1954 through July 31, 1974, the plaintiff received $70,812 in VA disability compensation, none of which is deductible from her recovery. She now receives such tax free compensation in the monthly amount of $655, which is equivalent to an annual wage of about $9,235 before federal income tax at the 1975 rates, assuming no other income, one personal exemption, and the use of the standard deduction.

| | | |
|---|---:|---:|
| Gross Salary—June 12, 1959–July 25, 1970 | | $106,165.20 |
| Less: | | |
| Terminal Leave | $332.00 | |
| CSC Retirement | 6,942.33 | |
| Federal Life Insurance | 778.98 | 8,053.31 |
| | | $98,111.89 |
| Credits: | | |
| Gross Civilian Earnings to June 20, 1967 | 39,276.14 | |
| Unemployment Compensation | 1,653.00 | 40,929.14 |
| Net to July 25, 1970 | | $57,182.75 |

The plaintiff is also entitled to recover back pay from July 25, 1970, in an amount to be determined pursuant to Rule 131(c).[2]

## CONCLUSION

Plaintiff is entitled to recover the sum of $57,182.75, representing back pay less offsets from June 12, 1959 to July 25, 1970, plus back pay and offsets from July 25, 1970, in an amount to be determined pursuant to Rule 131(c).

2. On January 16, 1974, the petition was amended to demand back pay and accumulated leave "and for such other and further relief as the Court may deem just and proper." There is no express prayer for reinstatement.