Davis, Judge,
delivered tbe opinion of tbe court:
Equipped witb findings made and corrective action taken by tbe Air Force Board for tbe Correction of Military Records (approved by the Secretary), plaintiff seeks further relief which he says the Air Force should have given him as a matter of law. We agree and hold that the service could not stop where it did in adjusting his status partially, but was required by its own determination to go the whole way.[1] The case concerns a resignation tendered and then withdrawn by plaintiff, a regular Air Force medical administrative officer. The withdrawal of the resignation was rejected by the Air Force and the resignation effectuated. In two separate proceedings, the Correction Board gave plaintiff some help but did not restore him to the regular roll. His claim is that we now know, as a necessary result of the Correction Board’s determinations, that the refusal to accept the with *35 drawal of the resignation was illegal and therefore that his separation was itself unlawful and void.
The parties have both moved for summary judgment, presenting as our record the two decisions of the Correction Board, several of the documents before it, and the Air Force actions following those proceedings. The Board’s findings and the record show this:[2] Captain Hankins was a career, regular Air Force officer whose service started as an enlisted man in 1946. By 1960-61 he had become a Captain in the Medical Service Corps, expert in hospital administration and stationed at an Air Force hospital in Turkey. He was, the Board found, “a highly dedicated officer, demonstrating high professionalism and attitude toward his duties and responsibilities”, but nevertheless he ran into much trouble from two superior officers who, for various extraneous reasons, exhibited great bias and prejudice toward him. A significant result of this attitude was that plaintiff’s three Officer’s Effectiveness Beports covering the periods from June 1960 to June 1961, from June 1961 to June 1962, and from June 1962 to December 1962 (when he was separated) graded him unjustly and far too low. On the first of these reports, one of the biased superiors tried to force the rating officer (plaintiff’s immediate chief, a captain) to lower and alter his favorable ratings and comments, and when this failed the higher-ranking superior (a colonel) appended “an inaccurate and bias[ed] in-dorsement.” When the second report (June 1961-June 1962) was about to be forwarded, the other vindictive superior (a major) unethically and surreptitiously lowered ratings after the report had been signed by the rating and indorsing officers. As for the third report (June 1962-December 1962), the Board said that “after careful examination and consideration of evidence submitted, with emphasis on statements and views expressed in applicant’s [plaintiff’s] behalf by many medical personnel stationed in and around Ankara, Turkey, as well as applicant’s apparent high qualifications (hospital administrator), this Board cannot accept the report as being *36 a fair and complete evaluation * * For these reasons the Board specifically “voided and removed from the record” each of these three unfavorable reports. (That was the basic relief the Board gave to plaintiff.)
But while the first two of these derogatory reports were still outstanding, plaintiff became seriously disturbed at the antagonism toward him by the two field-grade officers whose actions later caused the Board to nullify the effectiveness reports. In October 1961 he wrote to The Surgeon General of the Air Force detailing the treatment he had received at the hands of the colonel and the major (the latter subsequently promoted to lieutenant colonel), and asking for a transfer. The general’s deputy replied that Captain Hankins’ letter “was most informative and interesting”, referred to “your fine performance of duty as indicated by your records”, and said that his personal conflict would soon resolve itself with the pending rotation of the colonel in March 1962.[3] The captain also complained to the Inspector General at his post, but though the investigating officer later stated that he became aware “of the mental anguish and humiliation that [Captain Hankins] and his family were suffering as a result of his assignment”, nothing seems to have been done in time to prevent the plaintiff from seeking the only way out that seemed to him to be open. In June 1962, he tendered his written resignation from the Air Force, reciting the “most untenable situation” with which he had been required to live “for a 'long time” (including personal indignities), and indicating that for that reason he no longer wished to accept the advantages and disadvantages of service life which he and his family had always accepted in the past. In that connection he referred to “a number of civilian hospital position vacancies which offer excellent working conditions in addition to a salary which is far in excess of what I am currently drawing or hope to make for a number of years to come.”
Under Air Force regulations (A.F. Eeg. No. 36-12, July 1, 1960), a resignation cannot be automatically effective. It has *37 to be submitted through channels to the Headquarters of the Air Force in Washington, with the comments of intermediate commanders. Captain Hankins’ immediate commander recommended approval of the resignation “with regret”, adding that Hankins “is an extremely able and well trained worker and quite effective in his position.” (We do not know any of the other indorsements, if there were any.)
Sometime before the resignation reached the stage of being ready for action in Washington, plaintiff (in August 1962) sought to withdraw his tender. His reason was that both of the harassing superiors had now left the post — the first in the spring of 1962 and the other in the summer of that year — and a bright new day had dawned. He put it this way in his letter of withdrawal: “[S]ince submission [of the tender of resignation], conditions which prevailed at the time no longer exist. My family and I are most pleased with the recent turn in events. My confidence in military justice and the integrity of its officers has been restored. * * *”
Under A.F. Reg. No. 36-12, sufra, a withdrawal of a tender of resignation, like the tender itself, is not self-executing. The resignation cannot be withdrawn without the consent of the Secretary of the Air Force (or his designated representative) and has to be submitted through channels. The regulation also provides that “ [a]ny indorsement recommending disapproval [of a withdrawal] will state the reasons therefor.” Hankins’ local commanders (in Turkey) concurred in his withdrawal of the resignation,[4] but the European command of the Air Force disapproved it, referring to the captain’s effectiveness report for the period from June 1961-June 1962, his letter of resignation, and his communication of October 1961 to The Surgeon General. Thereafter, on recommendation of the Air Force Personnel Board, the Secretary of the Air Force disapproved the withdrawal (without giving a reason) and accepted the resignation. Plaintiff was discharged honorably on December 28, 1962 (this was later changed by the Correction Board, for reasons *38 now immaterial, to January 2, 1963). He had served almost sixteen years.
In his two proceedings before the Correction Board in 1964 and 1966, plaintiff succeeded (as we have already indicated) in having all the effectiveness reports from June 1960 to December 1962 voided, but he failed to be restored to his regular commission and to active duty.[5] His effort now is to obtain a judgment for back pay and allowances founded on a holding that he never lost his regular commission because he was never properly separated. Cf. Egan v. United States, supra note 1, 141 Ct. Cl. at 15, 18, 27, 158 F. Supp. at 386, 387, 392; Middleton v. United States, 170 Ct. Cl. 36, 39 (1965).
In our opinion he must prevail here, and should have been restored as a result of the Correction Board proceedings, because the Secretary of the Air Force acted on null and void efficiency records when he rejected plaintiff’s withdrawal of his resignation. We know that the report for June 1961-June 1962 was before the Secretary because the European commander expressly referred to that document in recommending disapproval of Captain Hankins’ retraction of the resignation. Probably the report for June 1960-June 1961 was also part of the material considered, both because it was an official personnel record and, more specifically, because it was mentioned in plaintiff’s letter to The Surgeon General and implicitly referred to in his resignation letter (to both of which documents the European commander pointed). These two efficiency reports have now been labeled by the Air Force (through the Correction Board proceedings) as unjust and void. An action resting significantly on such improper materials, as was the Secretary’s in this case, cannot be permitted to stand. It is, of course, a general principle that an administrative decision, even a discretionary one, grounded in considerations which the tribunal should not take into account, or evidence or materials it should not weigh, is vulnerable as arbitrary and unfounded. Cf. Harmon v. Brucker, 355 U.S. 579 (1958); Hamlin v. United States, decided this day, post, at 137; Motto v. United States, supra note 1, 172 *39 Ct. Cl. 192, 348 F. 2d 523; Egan v. United States, supra, 141 Ct. Cl. at 23-25, 158 F. Supp. at 390-91.
This fundamental doctrine is tied even more directly to this case by the clause in A.F. líeg. No. 36-12, supra, demanding that “[a]ny indorsement recommending disapproval [of a withdrawal of resignation] will state the reasons therefor” (approving indorsements, on the other hand, are not required to state reasons). The obvious aim of this provision is to inform the Secretary of adverse factors deemed important by a lower-level command. These matters the Secretary is plainly supposed to take into account. But in this instance the only disapproving indorsement, that of the European command, gave as one of its prime “reasons” a consideration— the unfavorable effectiveness reports — which we must now take as void, incorrect, and unjust. The Secretary was thus specifically asked to study factors which should not have been considered or relied upon.
It is theoretically conceivable that the Secretary’s action in rejecting the withdrawal was not based at all upon the European commander’s comment or on the voided records, but there is nothing to suggest that this was or could have been so. The Secretary gave no reason, and therefore it is entirely sensible to believe that he was influenced, as would be natural, by the void records before him and the adverse recommendation of the European commander. Cf. Hertzog v. United States, 167 Ct. Cl. 377, 385 (1964). If the Secretary had himself given some separate reason, the case would be quite different; however, that is not at all what happened. The Secretary acted in such a way as to compel the conclusion that he was influenced by the invalid records.
There is, moreover, no reason to assume that, if he knew the true facts at that time, the Secretary would have rejected the plaintiff’s retraction of his resignation.[6] The truth was, in the words of the Correction Board, that Captain Hankins had over 15 “devoted years of service”, “while a member of the service [he] performed and accomplished more than he *40 justly received credit for. In fact, one could say that at times his accomplishments could have placed him in the ‘performance over and beyond that normally required’ category”, and also that he “was a highly dedicated officer, demonstrating high professionalism and attitude toward his duties and responsibilities.” It is hard to conceive that the Secretary would have refused to permit such an officer to withdraw a resignation induced by unjust treatment and failure to accord him his due. It is true that the resignation said that plaintiff wished to accept civilian employment but this was clearly and inseparably linked in the letter to the troubles and vindictive impositions he had suffered — and this was made even plainer by the withdrawal letter. There could have been no mistake about that.
The only untainted reason the Correction Board gives for failing to restore plaintiff is, as we understand it, that his civilian work and his Air Force reserve duty since his discharge in January 1963 show that he is now so successfully adjusted to civilian life that justice does not require restoration at this time to the military. This might very well be a pertinent factor if plaintiff were seeking a new commission or reinstatement in an old commission from which he had been lawfully separated, but it is wholly irrelevant to the issue of whether he was legally discharged in 1963. His post-discharge history has no bearing on that question.
We hold, for these reasons, that plaintiff was not validly separated in 1963. Nor has he been legally discharged since that time. “[T]he only way an officer of the armed services can be dismissed therefrom is by those methods specifically spelled out by the statutes.” Boruski v. United States, supra note 1, 140 Ct. Cl. at 6, 155 F. Supp. at 324. As an officer of the regular Air Force, plaintiff could be involuntarily separated only under the very limited circumstances recognized by Congress. See 10 U.S.C. § 1161 (“Commissioned officers’ limitations on dismissal” — discharge as a result of a court-martial or in wartime).[7] Admittedly, none of those condi *41 tions occurred here. The Secretary’s approval (in 1964 and 1966) of the Correction Board’s refusals of restoration could not operate as a discharge because, for regular officers, that is not a discharge-method prescribed by the law, nor is it the equivalent of one of the specified processes.
It follows that plaintiff’s motion for summary judgment must be granted and the defendant’s denied. He is entitled to recover pay and allowances since his separation, less appropriate offsets, and judgment is entered to that effect. The amount of recovery will be determined under Eule 47(c).

 In a number of instances we have held that the Correction Board (or comparable tribunal) stopped too short, and the court was therefore compelled to implement the administrative findings and extend the Board’s action. E.g., Boruski v. United States, 140 Ct. Cl. 1, 155 P. Supp. 320 (1957) ; Egan v. United States, 141 Ct. Cl. 1, 158 F. Supp. 377 (1958) ; Schiffman v. United States, 162 Ct. Cl. 646, 319 F. 2d 886 (1963) ; Barnes v. United States, 163 Ct. Cl. 321 (1963) ; Lerner v. United States, 168 Ct. Cl. 247 (1964) ; Motto v. United States, 172 Ct. Cl. 192, 348 P. 2d 523 (1965) ; Wason v. United States, 179 Ct. Cl. 623 (1967) ; Cosgriff v. United States, 181 Ct. Cl. 730, 387 P. 2d 390 (1967) ; Hamlin v. United States, decided this day, post, at 137.

 We use only the findings in b< th reports of the Board (the first made in 1964 and the second in 1966), the allegations of the petition admitted by the answer, and the undisputed documentary evidence before the Board.

 The other biased superior remained at the hospital until the summer of 1962.

 Later, in a letter to the Correction Board, the local general said that plaintiff had been working “for an incompetent, vindictive supervisor backed up by a listless hospital chief.”

 The Air Force did give him a reserve commission.

 The same conclusion applies to the European commander if the resignation was still in his hands, under A.E. Reg. No. 36-12, supra, he had express authority to approve the withdrawal request if the resignation was in his possession and had not been forwarded to higher headquarters.

 In this respect reserve officers get less protected treatment. See 10 U.S.C. §§ 1162-63 (1964) ; Motto v. United States, supra, 172 Ct. Cl. at 198-99, 348 F. 2d at 526-27; Roberts v. Vance, 343 F. 2d 236 (C.A.D.C. 1964).