**John H. VanderMOLEN, Appellant,**

v.

**John C. STETSON, Secretary of the Air Force.**

**No. 76–1449.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 30, 1977.

Decided Nov. 16, 1977.

Statement on Sua Sponte Request for Rehearing En Banc Dec. 23, 1977.

---

Mary E. Baluss, Washington, D.C., with whom William H. Briggs, Jr., Michael J. Malley and David Addlestone, Washington, D.C., were on the brief, for appellant.

Richard A. Graham, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease and George A. Stohner, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and ROBB, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

Dissenting opinion filed by ROBB, Circuit Judge.

BAZELON, Chief Judge:

■ On February 19, 1971, appellant, John H. VanderMolen, was honorably discharged from the United States Air Force under Air Force Regulation (AFR) 36–3.[1] Claiming that his discharge was illegal, VanderMolen brought suit in United States District Court asking that he be reinstated on active duty in the Air Force, that he receive $9999.99 in damages,[2] and that the Air Force be required to remove from his records any notation that would bar him from reenlisting in the Air Force, and in particular remove any reference to AFR 36–3.[3] VanderMolen also alleged that the Air Force had illegally cancelled his scheduled promotion to captain, and he asked that his reinstatement be with the rank of captain and that his back pay be calculated at that rank. The district court granted appellee's motion for summary judgment and dismissed VanderMolen's complaint. We reverse.

## I. BACKGROUND

VanderMolen was commissioned as a Reserve Officer, Second Lieutenant, in the United States Air Force in April of 1967. His first assignment was an Intelligence Officer for the 327th Air Division at Taipei, Taiwan. His duties included collection, collation, and analysis of highly sensitive, top secret data dealing with the People's Republic of China. His Officer Efficiency Re-

---

1. AFR 36–3 prescribes the procedures for administrative discharges of officers for "substandard performances of duty."

2. 28 U.S.C. § 1346(a) provides that:
   (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
   
       *     *     *     *     *     *
   
       (2) Any . . . civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
   
   Although, if his allegations are proven, VanderMolen may in fact have been *damaged* by the Air Force in an amount exceeding $10,000, he is asserting a "claim against the United States" for only $9,999.99; "all other claims for monetary relief have been waived." Brief for Appellant at 60. If the damages in excess of $10,000 are waived, the district court may retain jurisdiction. *See Sutcliffe Storage & Warehouse Co., Inc. v. United States,* 162 F.2d 849, 853 (1st Cir. 1947); *United States v. Johnson,* 153 F.2d

846, 848 (9th Cir. 1946); *Hill v. United States,* 40 F. 441, 442–43 (C.C.D.Mass.1889); *Wolak v. United States,* 366 F.Supp. 1106, 1110 (D.Conn. 1973); *Brown v. United States,* 365 F.Supp. 328, 337 (E.D.Pa.1973), *aff'd in part and rev'd in part on other grounds,* 508 F.2d 618 (3d Cir. 1974), *cert. denied,* 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975); *Armstrong & Armstrong, Inc. v. United States,* 356 F.Supp. 514, 521 (E.D.Wash.1973), *aff'd* 514 F.2d 402 (9th Cir. 1975); *Perry v. United States,* 308 F.Supp. 245, 247 (D.Col.1970), *aff'd* 442 F.2d 353 (10th Cir. 1971); *Rivoli Trucking Corp. v. United States,* 221 F.Supp. 532, 533 (S.D.N.Y. 1963). *But see, Pioneer Gen-E-Motor Corp. v. Department of the Army,* 135 F.Supp. 871, 872 (N.D.Ill.1955); *Thompson Foundry & Machine Co. v. United States,* 67 F.Supp. 121, 122 (M.D. Ga.1946).

3. VanderMolen also asked that he be reinstated in the Air Force reserve and that his last two officer efficiency reports, JA at 100, 107, be changed to reflect the evaluation of his immediate superior Captain Pozzo, rather than the judgment of those who evaluated him solely on the basis of their perceptions of his opposition to nuclear weapons. *See* note 18 *infra.*

ports (OER's) at this time portray "a very fine, exceptionally mature, professionally competent young officer."[4] His superior, Lt. Col. Brown, praised his "keen analytical capability, high degree of intelligence, [and] unswerving dependability and dedication to duty . . . ."[5]

In March, 1970, VanderMolen, now a First Lieutenant, was assigned to attend a Missile Launch Officer's Course at Chanute Air Force Base, Illinois. During the first few days of introductory classroom instruction, VanderMolen and his fellow students were advised by an instructor, Lt. James Tindell, that anyone having personal qualms about the overall nuclear weapons mission of the Air Force or about his ability to handle a missile launch assignment, should speak up immediately so that neither the Air Force nor the student would needlessly invest in the training.[6] At this time VanderMolen also learned, for the first time, of the substantial possibility that United States nuclear deterrent strategy may be in part premised upon the "extensive destruction of large population centers" and that Launch Control Officers would not be informed of the targets of the missiles that they launched.[7]

This information disturbed VanderMolen, and he decided to accept Lieutenant Tindell's invitation to speak with him. Tindell's written counseling record states that "Lt. Vandermolen expressed . . . his belief that nuclear war or a nuclear force is not right. His religious beliefs and convictions will not allow him to be a part of a nuclear weapon system."[8] Lt. Tindell referred VanderMolen through the chain of command for counseling.[9] He was ultimately counseled by Col. John A. Walker, Jr., Chief of the Department of Missile Training. "By this time," VanderMolen states in his affidavit to the district court,

my feelings had crystallized as a result of my research, counseling, and soul searching. . . . I told Col. Walker *that I supported various concepts of nuclear strategy, except as they called for the use of nuclear weapons to kill as many people or to render uninhabitable as large an area as possible.* I said that if I could be assured that the United States did not employ such a nuclear strategy most, if not all, of my qualms about serving as a Launch Control Officer would be eliminated. I also assured Col. Walker during this counseling session that regardless of what Col. Walker recommended or the ultimate outcome of my predicament, I would perform all my duties as an Air

---

4. JA at 81; *see* JA at 78–87.

5. *Id.* at 87. Lt. Col. Brown concluded that VanderMolen's "performance, bearing and potential mark him as one of our finest young officers and deserving identification as one of the future Air Force leaders." *Id.*

6. *Id.* at 58–59.

7. *Id.* at 59.

8. *Id.* at 88.

9. VanderMolen was counseled by Captain Admire, Captain Gootee, and Lieutenant Ofner. In his Counseling Record Captain Admire noted that, although VanderMolen "definitely wanted to initiate procedures to withdraw from training, . . . should he have to continue training, he would do so to the best of his abilities. However, he would continue to indicate, to anyone, that his conviction against this assignment would remain firm as he is unable to justify to himself the contributions to U.S. war efforts that he feels his missile duties would require. Accordingly, he maintains, an

end to training at this time would save USAF funds on his behalf." Id. at 89.

Captain Gootee noted in his Counseling Record that VanderMolen had stated "that he could not, and would not, be responsible for launching nuclear tipped Missiles against targets containing civilian personnel. When questioned as to whether or not he would launch against military targets he stated he was undecided. Lt. Vandermolen [stated] that he feels it would be morally wrong to launch the nuclear force in any circumstance, even if attacked." Id., at 90. Captain Gootee stated that, "Lt. Vandermolen would probably be successful in another AFSC and I recommend he be considered for reassignment into another career field." Id.

Lieutenant Ofner concluded in his Record that VanderMolen "is basically opposed to the use of nuclear weapons, offensive or defensive." Id. at 91. He recommended that VanderMolen "be eliminated from training and be returned to the intelligence field for utilization there." Id.

Force Officer to the very best of my ability.[10]

Col. Walker's Counseling Report of April 3, 1970, however, attributes to VanderMolen a slightly broader ground of opposition:

Lt. Vandermolen appears to be genuine in his belief that he does not believe he would be able to perform the Missile Launch Officer's tasks if required to launch missiles. *He bases his belief on moral convictions against his taking a direct part in use of nuclear weapons;* however, he did point out that he appreciates the status of our missiles as a deterrent force. Lt. Vandermolen indicated that he was not a volunteer for Missile Launch Officer duty and until attendance in Course 30BR1821G, Missile Launch Officer, WS–133A, did not realize what the Launch Officer duty entailed. Based on his ability, he should be able to perform in other career fields not related to the Human Reliability Program.[11]

On April 6, 1970, a Faculty Board was convened pursuant to the provisions of AFR 53–15 (including ATC Supp. 1, 15 January 1970)[12] to consider VanderMolen's removal from the training course. The Board recommended VanderMolen's removal from the course under Air Force Manual (AFM) 35–99 (2 July 1965). AFM 35–99, the Human Reliability Program, establishes "the requirements and responsibilities for screening, selecting, and continuously evaluating all personnel who control, handle, [or] have access to . . . nuclear weapons . . . ."[13] VanderMolen was the only witness in the Faculty Board proceeding. The Faculty Board recorded a summary of its proceedings that stated:

Lt. Vandermolen *firmly expressed a "religious, moral" objection to the use of nuclear weapons, CB [chemical/biological] agents,* or destruction of population centers. He felt he could successfully complete course 30BR1821G but *could not perform any duty in the release of nuclear weapons or CB agents or be directly involved in causing the destruction of population centers.* He felt he could perform effectively in his previous career field, intelligence. He felt no responsibility for any combat (possible or actual) usage of intelligence information processed by him.[14]

VanderMolen's later affidavit to the district court, however, states that, "I testified before the Board *restating my personal, philosophical, moral, and religious difficulties with the use of nuclear weapons on civilians, exactly as I had stated these difficulties to Col. Walker."* [15]

VanderMolen's description of the proceedings of the Faculty Board are undisputed:

A secretary was present at the Faculty Board to take notes; however, no verbatim transcript was compiled. During these proceedings I was never advised of the procedural protections of AFR 11–1, nor was I informed of any rights I might have had to such protection. Accordingly, I did not call witnesses on my behalf and did not contest the admissibility of evidence presented by the government. I was not represented by counsel during this hearing. Indeed, throughout the counseling sessions at the school, no one ever suggested that I should see a lawyer or hinted that I might need one. I did think briefly of consulting a lawyer on my own, but the aura of general informality and goodwill present throughout the entire counseling process at the school caused me to dismiss the idea. Furthermore, I felt no need to seek an attorney since Col. Walker had advised me that my removal from the school would not jeopardize my Air Force career, except that

---

10. *Id.* at 62 (emphasis added).

11. *Id.* at 94 (emphasis added).

12. AFR 53–15 is the regulation prescribing procedures for faculty boards at USAF schools.

13. AFM 35–99 at i.

14. JA at 97 (emphasis added).

15. *Id.* at 63–64 (emphasis added).

in the future I would be restricted from handling nuclear weapons.[16]

The Board decided that VanderMolen

should be disenrolled from training due to his expressed deficiency under AFM 35–99. He should not be considered for reinstatement in any career area governed by AFM 35–99. In the interest of economy, he should not be considered for further technical training but should be returned to his previous career field of intelligence.[17]

VanderMolen was accordingly assigned to the 66th Missile Squadron (SAC), 44th Strategic Missile Wing, South Dakota, where he was temporarily assigned as Squadron Executive Officer for the 28th Field Maintenance Squadron. He continued to perform so as to receive extremely favorable evaluation from his superior officer.[18]

Nevertheless, VanderMolen's Air Force career began to slide precipitously. Although VanderMolen had been scheduled for promotion to captain on April 19, 1970, his promotion was withheld for the stated reasons that:

Tech Tng Center, Chanute AFB, Ill MSG dated 9 April 1970, to SAC/DPMTO: Officer disqualified UP AFM 35–99, msl tng terminated this date. Officer expresses objection to use of Nuclear Weapons because of religious and moral beliefs.[19]

On May 21, 1970, Lt. Robert Melvin recommended that a discharge proceeding be initiated against VanderMolen pursuant to AFR 36–3, para. 4(f).[20] He stated that:

as evidenced by the existence of one or more of the circumstances outlined in this paragraph, or similar circumstances. . . .

\* · \* \* \* \* \*

a. Failure to demonstrate acceptable qualities of leadership required of an officer of his grade.

b. Failure to achieve acceptable standards of professional (including technical) proficiency required of an officer of his grade.

c. Failure (including lack of ability) to properly discharge assignments commensurate with his grade and experience.

d. A progressive downward trend in duty performance resulting in an unacceptable record of efficiency.

e. A record of marginal service over an extended period of time . . ..

f. Apathy, defective attitude, or other character disorders wherein the officer is unable or unwilling to expend effort.

Actions under AFR 36–3 are begun by the "recommendation" of "any commander who receives information indicating that an officer under his jurisdiction" meets the criteria of paragraph 4. Actions are then "initiated" by wing or base commanders. In VanderMolen's case, Colonel Charles Adams initiated an action on May 25, 1970.

After an action has been initiated, AFR 36–3, para. 17, requires that a Selection Board be constituted in order

(a) To evaluate all information concerning the matter under consideration,

(b) To determine whether the allegations are sufficiently serious and whether there is sufficient substantiation of the allegations against the officer to require him to show cause for retention in the Air Force, and if so,

(c) To determine the reasons why the officer should be required to show cause for retention. . \. .

---

**16.** *Id.* at 64.

**17.** *Id.* at 97.

**18.** In his OER of July 28, 1970, Captain Pozzo, VanderMolen's immediate supervisor, stated that "First Lieutenant Vandermolen has performed in an outstanding manner. . . . He has shown the greatest enthusiasm and interest in his work. He always strives for perfection in the work that he accomplishes and demands the same from his subordinates. . . . Vandermolen's most outstanding strength in his positive can-do attitude." *Id.* at 101. Colonel Lawson, however, refused to endorse Pozzo's evaluation. Although conceding that "Vandermolen has performed his duties in this Wing in excellent fashion," Lawson concluded that VanderMolen's "personal convictions would impair his effectiveness in any assignment associated with active combat operations. I believe that this personality trait seriously degrades his value to the Air Force." *Id.* at 101–02.

In a second OER, dated August 23, 1970, VanderMolen received low ratings from Lt. Colonel Kenneth Thompson. Lt. Col. Thompson acknowledged that he had "never personally observed Lt. Vandermolen's performance" and had "no knowledge of his ability to perform his primary duties of an Intelligence Officer." Thompson justified his low evaluation on the basis of his perception of VanderMolen's refusal "to perform lawful duties involving nuclear weapons for national defense." *Id.* at 107.

**19.** *Id.* at 108.

**20.** *Id.* at 113. AFR 36–3, para. 4 states:

(4) . . . A recommendation for action under this regulation is appropriate when the officer's performance of duty is substandard

I recommend this action because Lt. Vandermolen, while attending Missile Launch Officer's Course OBR1821G at Chanute AFB, Illinois, expressed a firm religious, moral objection to the use of nuclear weapons and CB agents, or destruction of population centers. He was permanently disqualified for missile duty under provisions of AFM 35–99 on 3 Apr 70, and subsequently released from missile school. I believe this officer has a defective attitude toward the military service and its obligations, rendering him noneffective as a line Air Force Officer.

JA at 113.

On August 10 a Selection Board consisted of three SAC Air Force Colonels determined that VanderMolen should be required to "show cause for retention in the Air Force." [21] VanderMolen chose not to resign, but to place his case before a Board of Inquiry.[22] The Board met on November 18. It had before it a statement written by VanderMolen on his own behalf, numerous favorable OER's and statements, letters, and affidavits from VanderMolen's past superior officers, as well as the records of the proceedings of the Selection Board, Melvin's recommendation, the report of the Faculty Board at Chanute, and various other documents pertaining to his dismissal from Missile Launch Officer's School. At the outset, VanderMolen argued that the administrative process leading up to the Board was defective and, in some respects, unconstitutional.[23] He moved that the action against him be dismissed. When his motion was denied, he refused to participate further in the hearing. As a result, no witnesses testified.[24] The Board recommended that VanderMolen be honorably discharged for the reason "that while attending Missile Launch Officer's Course . . . at Chanute, . . . he expressed a doubt as to his ability to execute a missile launch order, thereby necessitating his removal from the course of instruction." [25]

---

If the Selection Board determines that an officer be required to "show cause for retention in the Air Force," and if the officer declines to resign, AFR 36–3, para. 23, provides that a Board of Inquiry be established to conduct a "fair and impartial hearing," evaluate the evidence, and make appropriate recommendations. The burden of proof remains upon the officer "to effectively refute, rebut, or raise serious doubt concerning the reasons for his selection to show cause for retention."

**21.** JA at 122. *See* note 20, *supra.*

**22.** Alleging "potential unauthorized Command influence," VanderMolen asked that the Board be composed of members chosen from a cross section of Air Force Commands; he also requested that a portion of the Board hearing be classified so that he could present classified incidents that occurred during his duty in Taiwan which had influenced his decision not to "cover-up" his doubts at Chanute. Both requests were denied.

**23.** VanderMolen also renewed his challenges to the Board's composition and to its failure to classify portions of its hearing.

**24.** VanderMolen had earlier submitted a list of 21 proposed witnesses. There is some dispute in the record as to whether the Air Force refused to make several of these witnesses available to VanderMolen. In his affidavit to the district court, VanderMolen alleges that, although seven of these witnesses were then stationed at Ellsworth, "these and other witnesses were not made available by the Air Force." JA at 72. However, VanderMolen's counsel stated before the Board of Inquiry that "we did make a request for witnesses, and we are completely satisfied with the efforts made on the Government's part to provide us with any aid we needed in the preparation of our case." *Id.* at 233.

**25.** *Id.* at 149. The Board's Statement of Reasons recites that:

First Lieutenant John H. Vandermolen, 535–46–1869 FV, has, in the performance of his duties, fallen below the standards prescribed for an officer of his grade and experience, as evidenced by:

a. His failure to demonstrate acceptable qualities of leadership required of an officer of his grade in that, on or about 31 March 1970, while attending Missile Launch Officer's Course 30BR1821G at Chanute Air Force Base, Illinois, he expressed a doubt as to his ability to execute a missile launch order, thereby necessitating his removal from the course of instruction.

b. His failure to properly discharge assignments commensurate with his grade and experience in that, on or about 31 March 1970, while attending Missile Launch Officer's Course 30BR1821G at Chanute Air Force Base, Illinois, he expressed a doubt as to his ability to execute a missile launch order, thereby necessitating his removal from the course of instruction.

The discharge was reviewed and approved by the Air Force. On February 19, 1971, VanderMolen received an "honorable discharge." However, his separation papers (D.D. Form 214) carry an "SDN Number" indicating that his discharge was under AFR 36–3.[26]

VanderMolen has exhausted his administrative remedies. *See Cunningham v. United States,* 549 F.2d 753, 765 (Ct.Cl.1977); *Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 80–81, 518 F.2d 466, 473–74 (1975). After his discharge he applied to the Air Force Board of Correction for Military Records, seeking essentially the same relief that he later sought in the district court. The Board denied his petition.

## II. VanderMOLEN'S DISCHARGE

Appellant VanderMolen masses a battery of arguments attacking his discharge as in violation of his constitutional rights and in violation of the Air Force's own regulations. Because we find that his discharge in fact was based upon information obtained in violation of the procedures required by AFR 53–15 (including ATC Supp. 1, 15 January 1970), we do not reach the serious constitutional questions raised by VanderMolen's complaint.[27] *See Harmon v. Brucker,* 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958).

■ It is, of course, a fundamental tenet of our legal system that the Government must follow its own regulations. Actions by an agency of the executive branch in violation of its own regulations are illegal and void. *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). This principle is fully applicable to the Air Force. *Mogavero v. McLucas,* 543 F.2d 1081, 1085 (4th Cir. 1975); *Geiger v. Brown,* 136 U.S.App.D.C. 132, 135, 419 F.2d 714, 717–19 (1969); *Powell v. Zuckert,* 125 U.S.App.D.C. 55, 61, 366 F.2d 634, 640–41 (1966).[28]

VanderMolen contends that the Faculty Board Proceedings at Chanute are tainted and illegitimate because they denied him important procedural rights guaranteed by Air Force Regulations. The Faculty Board was convened pursuant to AFR 53–15 (including ATC Supp. 1, 15 January 1970). Paragraph 4(c)(5) of AFR 53–15 states that:

[P]roceedings of faculty boards which inquire into the conduct, efficiency (not to be confused with flying ability), fitness, or pecuniary liability of the student as a member of the Air Force, must follow all

---

c. His defective attitude toward his assigned duties in that, on or about 31 March 1970, while attending Missile Launch Officer's Course 30BR1821G at Chanute Air Force Base, Illinois, he expressed a doubt as to his ability to execute a missile launch order, thereby necessitating his removal from the course of instruction.

d. His unwillingness to accept the obligations and responsibilities expected of an officer in that, on or about 31 March 1970, he expressed a doubt as to his ability to execute a missile launch order, a duty for which he was then being trained, thereby self-initiating a course of events which culminated in his greatly limited assignment eligibility and potential usefulness; a self-imposed status incompatible with his oath of commission and unique to a line officer of the United States Air Force.

Reasons (a), (b) and (c) apparently track AFR 36–3, para. 4(a), (c) and (f). *See* note 20 *supra.*

**26.** Upon VanderMolen's request, this SDN number will be removed. AFR 35–6, § 4–5 (16 Sept. 1974). However, VanderMolen alleges

that the cause of his discharge will permanently impair his ability to be employed by the Air Force, the Air Force Reserve, or by the United States Government in general.

**27.** VanderMolen alleges that his discharge deprived him of property and liberty without due process of law, and that it violated his First Amendment rights by punishing his exercise of pure speech in a manner unjustified by military necessity. *See Avrech v. Secretary of the Navy,* 171 U.S.App.D.C. 368, 374, 520 F.2d 100, 106 (1975) (Wright, J., dissenting), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2165, 48 L.Ed.2d 793 (1976); *Carlson v. Schlesinger,* 167 U.S.App.D.C. 325, 333, 511 F.2d 1327, 1335 (1975) (Bazelon, C. J., dissenting).

**28.** *See Mindes v. Seaman,* 453 F.2d 197, 201 (5th Cir. 1971); *Dunmar v. Ailes,* 121 U.S.App.D.C. 45, 47, 348 F.2d 51, 53 (1965); *Roberts v. Vance,* 119 U.S.App.D.C. 367, 343 F.2d 236 (1964).

requirements of AFR 11–1 except when a student is enrolled in a precommissioning school.

Similarly, Paragraph 3c(2)(a)–1 of ATC Supp. 1 states:

> When it is anticipated that the board action could jeopardize a student's commission, rating, grade or status, or possibly cause his separation or demotion . . . all requirements of AFR 11–1 must be met.[29]

Finally, paragraph 4 of ATC Supp. 1 strongly implies that faculty board proceedings cannot be used as the basis for administrative discharges under AFR 36–3 unless the requirements of AFR 11–1 have been met:

> A faculty board is a fact-finding agency appointed to consider all circumstances relative to a student's training and to arrive at specific recommendations regarding retention in training or disenrollment from training. Board proceedings are used primarily as the basis for student personnel actions relative to training status. When conducted under AFR 11–1 and declared legally sufficient, board proceedings may be used as the

basis for further administrative action such as that authorized in AFR 36–2/3 . . . . .

▮ Even if the Faculty Board Proceedings at Chanute cannot be said to have inquired into VanderMolen's conduct, efficiency, or fitness *"as a member of the Air Force,"* it is manifest, as VanderMolen's subsequent history demonstrates, that there was the strong possibility that the findings of the Board could jeopardize his "commission, rating, grade or status, or possibly cause his separation." The evident good intentions of the instructors at Chanute cannot change this fact. The procedural protections of AFR 11–1 should therefore have attached. Any other conclusion would render meaningless the protections of ATC Supp. 1, para. 3c(2)(a)–1.

AFR 11–1 guarantees, among other rights, the right to counsel,[30] the right to a verbatim transcript,[31] the right to notification of specific allegations,[32] the right to call and cross-examine witnesses,[33] the right to challenge Board members for cause,[34] and the right to legal review by the staff judge advocate.[35]

---

**29.** In addition, Paragraph 4c(5) states:

> If during board proceedings, the testimony or other evidence indicates that the board action may jeopardize a student's commission, rating, grade or status, the proceedings must be stopped and the student advised by qualified legal personnel of his constitutional rights regarding self-incrimination. He is extended the privilege of legal counsel and is notified in writing of the specific allegations and questions to be considered by the board. Subsequent board proceedings must meet all requirements of AFR 11–1. Instead of reconvening the board, a new board should be appointed. The transcript of prior proceedings may be appended to the case file for review by the convening and approving/disapproving authority.

**30.** Paragraph 8(b) states that counsel will be provided an individual "in any proceeding which may fairly be regarded as:

> (1) Subjecting him to possible criminal prosecution, or disciplinary or corrective administrative action;
> (2) Jeopardizing a commission, rating, grade, or status;
> (3) Furnishing cause for possible elimination or demotion proceedings against him . . . . .

Paragraph 8(c) states that "questions of doubt as to . . . the privilege to be represented by counsel in any given case will be resolved in favor of the individual concerned."

In addition, paragraph 10(a) states that

> A person whose conduct, efficiency, fitness, or pecuniary liability is under investigation will be extended the privilege of counsel, as provided in paragraph 8, will be permitted to be present at all open sessions of the board, to cross examine witnesses appearing against him, and to call witnesses and present evidence in his own behalf.

Finally, an individual is entitled to be notified of his right to counsel. Paragraph 6(a)(5).

**31.** ATC Supp. 1 states that "Proceedings of faculty boards subject to legal review requirements of AFR 11–1 are recorded verbatim." Para. 4c(6)(f). *See* AFR 11–1, para. 16.

**32.** AFR 11–1, para. 6(a)(2).

**33.** *Id.* at para. 6(a)(4), 10(a).

**34.** *Id.* at para. 7(a).

**35.** *Id.* at para. 17.

■ It is undisputed, however, that VanderMolen was neither granted these rights, nor even notified of their existence. He called no witnesses, did not contest the admissibility of any evidence, and was not even represented by counsel. No verbatim transcript of the proceedings was prepared. Such a massive violation of procedural rights would, standing alone, be sufficient to render void the Faculty Board proceedings. *See Henderson v. United States*, 175 Ct.Cl. 690, 701 (1966). This conclusion is that much stronger when, as here, there is a strong likelihood that these violations have actually been prejudicial. There is a disagreement in the record, for example, about the exact nature of the doubt expressed by VanderMolen. Appellant claims in his affidavit before the district court that he objected only to "the use of nuclear weapons on civilians," whereas the Summary of the Faculty Board Proceedings records a broader objection "to the release of nuclear weapons or CB agents." There is some support for VanderMolen's affidavit in the form of a letter written on June 16, 1970, by Colonel Walker with reference to the AFR 36–3 action then initiated against VanderMolen:

> When Lt Vandermolen first began counseling, it appeared he was confused and had given only superficial thought to the extent of his moral objection. Although he made his objection to the use of nuclear weapons quite apparent, he was not able to articulate his specific reservations. His initial objections were vague and difficult to pinpoint. However, as counseling continued by various

members of the instructor staff, Lt Vandermolen became more capable of communicating explicitly his specific moral objection to the use of nuclear weapons against civilian population centers. This objection later was expressed quite directly to the faculty board.[36]

Without a verbatim transcript of the Faculty Board Proceedings it is of course impossible to review its findings. If in fact the Summary of the Faculty Board's findings mischaracterized VanderMolen's position, serious prejudice might have resulted. *See Cruz-Casado v. United States*, 553 F.2d 672, 675 (Ct.Cl.1977).

■ It follows that the findings of the Faculty Board cannot legitimately have been used as the basis for any subsequent punitive action against VanderMolen. Paragraph 4 of ATC Supp. 1 reinforces this conclusion. Yet these findings were the primary evidence against VanderMolen before the Board of Inquiry that recommended his discharge under AFR 36–3.[37] "An action resting significantly on such improper materials . . . cannot be permitted to stand. It is, of course, a general principle that an administrative decision, even a discretionary one, grounded in considerations which the tribunal should not take into account, or evidence or materials it should not weigh, is vulnerable as arbitrary and unfounded." *Hankins v. United States*, 183 Ct.Cl. 32, 38 (1968).

In *Hankins* the presence in the record of two invalid OER's was deemed sufficient to overturn a decision of the Secretary of the Air Force to reject a withdrawal of a resig-

---

**36.** JA at 95. Colonel Walker's letter also stated that:

> During his tenure as a student here, the instructor staff and I were favorably impressed with Lt. Vandermolen as a sincere and conscientious young officer who would perform capably in a career field divorced from the utilization of nuclear weapons. Particularly impressive was his attitude toward the program and the career field when he stated, "If I have to remain in the school at Chanute, I will do my best. If I am sent to ORT at Vandenberg, I will do my best. And if I am assigned to an operation SAC base I will continue to do my best. But I will con-

> tinue to communicate my objections to anyone who will listen, since I cannot be certain I will be able to turn the key if required to do so." His Block I grade was 86 which is above average for the course. This indicates he did attempt to do his best while here, although he obviously was encumbered at the time with the decision facing him.

**37.** *Id.* at 229–30, 113. There is a very strong likelihood that the findings were the basis for Colonel Melvin's recommendation of action against VanderMolen, since his statement of reasons reproduces, almost verbatim, the language of the Faculty Board's findings.

nation. In this case, the findings of the Board of Inquiry must similarly be overturned. Therefore appellant was not legally discharged in 1971. He is entitled to reinstatement in the Air Force reserve and reinstatement on active duty in the Air Force. *See Cruz-Casado v. United States*, 553 F.2d 672, 676 (Ct.Cl.1977). In addition, all reference in his Air Force records to the SDN Code Number, and any and all other reference to AFR 36–3, must be removed, as well as any references to the findings of the Faculty Board at Chanute. Appellant should receive as damages the back pay to which he is entitled from the date of his separation from the Air Force, less appropriate offsets, *see Cunningham v. United States*, 549 F.2d 753, 758 (Ct.Cl.1977); *Yee v. United States*, 512 F.2d 1383, 1389 (Ct.Cl. 1975), the total not to exceed $9,999.99.

### III. THE CANCELLATION OF VanderMOLEN'S SCHEDULED PROMOTION TO CAPTAIN

VanderMolen also alleges that the cancellation of his scheduled promotion to captain was illegal and should be rescinded.

▮ The promotion of a military officer is a discretionary act. *Orloff v. Willoughby*, 345 U.S. 83, 90, 73 S.Ct. 534, 97 L.Ed. 842 (1953). This court will not overturn a discretionary determination of the Air Force Board of Correction for Military Records unless it can be shown that "the Board's decision was arbitrary, capricious or unlawful." *Dorl v. United States*, 200 Ct.Cl. 626, 633, *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973). "Ratings and promotions are discretionary matters with which the court will continue to be 'scrupulous not to intervene' unless clear error is shown or relief is mandated by law or regulation." *Boyd v. United States*, 207 Ct.Cl. 1, 13 (1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). This is especially true since "[t]he promotion of an officer in the military service is a highly specialized function involving military requirements of the service and the qualifica-

tions of the officer in comparison with his contemporaries, plus expertise and judgment possessed only by the military." *Brenner v. United States*, 202 Ct.Cl. 678, 693–94 (1973), *cert. denied*, 419 U.S. 831, 95 S.Ct. 54, 42 L.Ed.2d 56 (1974).

It must be emphasized, however, that this case does not concern an ordinary denial of a promotion. VanderMolen was actually scheduled to be promoted to captain, and his promotion was cancelled *for two stated reasons*. These reasons were "officer disqualification UP AFM 35–99 . . . . Officer expresses objection to use of Nuclear Weapons because of religious and moral beliefs." [38]

▮ VanderMolen challenges the first of these reasons, arguing that his disqualification under AFM 35–99 should not have been used as a basis for the denial of his promotion to captain. We agree with him. Paragraph 6 of AFM 35–99 states clearly that:

the assignment disqualification of any member under this manual is not of itself cause for punitive measures or an adverse reflection upon the individual. Disqualification will not be used to justify or to avoid appropriate proceedings under the Uniform Code of Military Justice or under existing regulations on administrative processing or separation of individual members.

To use a disqualification under AFM 35–99 as a justification for the denial of a promotion is manifestly to use it as a "cause for punitive measures" in violation of the terms of the manual.

Appellant cites *Grimm v. Brown*, 449 F.2d 654, 655 (9th Cir. 1971), for the proposition that if the military proceeds against an individual for several reasons that are "inextricably interwoven," and if one of those reasons is unlawful, the procedure as a whole is unlawful. *See Clay v. United States*, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971). *Grimm*, however, is inapplicable to the facts of VanderMolen's case. *Grimm* concerned charges against an

**38.** *See page 9 supra.*

Air Force officer before a Board of Inquiry. In such a procedure the Air Force must follow specific standards and regulations. The promotion of an officer, by contrast, is entirely discretionary. No law or regulation mandated appellant's promotion. *Cooper v. United States*, 203 Ct.Cl. 300, 304 (1973). This court "cannot postulate that a discretion to promote would be exercised favorably" if there remains a valid ground for the Air Force to have withdrawn VanderMolen's promotion. *Clinton v. United States*, 191 Ct.Cl. 604, 605, 423 F.2d 1367, 1368 (1970). *See Yee v. United States*, 512 F.2d 1383, 1388 (Ct.Cl.1975). We must therefore inquire into the second reason for the cancellation of VanderMolen's promotion, his objection to the use of nuclear weapons.

Unfortunately, the record is simply not adequate at this time to sustain a determination of the legal validity of this reason. If it is based upon the findings of the Faculty Board, as appears most likely,[39] then it is illegitimate, and there are no reasons at all justifying the cancellation of VanderMolen's promotion. In such circumstances the cancellation must be overturned as arbitrary and capricious. *See Bridgman v. United States*, 185 Ct.Cl. 133, 137, 399 F.2d 186, 190 (1968). If, on the other hand, the cancellation was based on untainted evidence, such as VanderMolen's counseling records, we do not think a court should interfere with legitimate military discretion in this area.

Our disposition of the case does not require us to consider appellant's argument that the Air Force also violated the procedural requirements of AFR 36–3.[40]

*Reversed and remanded to the district court for further proceedings not inconsistent with this opinion.*

ROBB, Circuit Judge, dissenting:

VanderMolen, an officer in the United States Air Force, announced that he doubt-ed his ability to execute a missile launch order unless he approved the target of the missile. In view of his attitude the Air Force gave him an honorable discharge. Now the majority of this court holds that he must be reinstated on active duty with back pay; and the majority goes further and intimates that he is entitled to promotion. I cannot accept these conclusions. I think the Air Force was entitled to discharge an officer who might refuse to obey a legal order and I find no prejudicial defect in the discharge proceedings.

The majority says "There is a disagreement in the record, . . . about the exact nature of the doubt expressed by VanderMolen. Appellant claims in his affidavit before the district court that he objected only to 'the use of nuclear weapons on civilians,' whereas the Summary of the Faculty Board Proceedings records a broader objection 'to the release of nuclear weapons or CB agents.'" The majority speculates that "serious prejudice might have resulted" if VanderMolen's position was mischaracterized by the Faculty Board. Assuming that there was a misstatement of the "exact nature" of the doubt, I cannot agree that there was prejudice. VanderMolen does not deny that he objected and continues to object to deployment of missiles against civilian population centers, and that because of his objection he was and still is disqualified from nuclear missile duty. Nor does VanderMolen or the majority question the policy of the Air Force, to discharge any line officer who seeks to limit or select the orders he will obey. Indeed, that policy cannot be successfully challenged; a soldier whose obedience to legal orders is qualified or selective has no place in the military. Accordingly, even if the Faculty Board had stated VanderMolen's objections in narrower terms the Board of Inquiry would still have been obliged to recommend his discharge. He would still

---

**39.** *See id.* at 98.

**40.** Appellant argues that his expression of doubt cannot be construed as "substandard performance of duty" under the terms of the regulation. He also argues that AFR 36–3 was violated when the Air Force made no attempt to rehabilitate him or adequately to investigate the charges against him.

have been disqualified from missile duty; he would still have been seeking to qualify his obedience to orders. The "exact nature" of the doubt prompting his disobedience was immaterial.

The purpose of the Faculty Board was only to inquire into VanderMolen's qualifications for participation in the Missile Launch Officer's Course. According to VanderMolen the atmosphere "throughout the entire counseling process" was one of "informality and good will". [VanderMolen affidavit filed in District Court, J.A. 64] He has conceded that "The Administrative processing and handling of my case at Chanute was conducted as impartially and fairly as possible". [VanderMolen letter responding to Notification of Selection to Show Cause for Retention, J.A. at 127, 128] The Faculty Board concluded that VanderMolen should be removed from the Missile Launch Officer's Course, and he agreed. [Affidavit, J.A. 63]

Even if the Faculty Board proceedings were defective for failure to conform to the requirements of AFR 11–1, the full hearing afforded VanderMolen by the Board of Inquiry was sufficient to cure any errors. At the Board of Inquiry VanderMolen was represented by counsel and had the opportunity to call witnesses, and all the other rights provided by AFR 11–1. Moreover, before the hearing VanderMolen wrote to the Board of Inquiry explaining that he was opposed only to the destruction of civilian population centers. [J.A. 138–43] In his four-page single-spaced statement he fully explained his position, saying in part:

> . . . Based on my limited knowledge, I currently have no moral objections to their [nuclear weapons'] potential deployment against military installations, war goods producing factories, or other strategic targets.
>
> However, I do morally object to the existence and deployment of any nuclear weapon system which has the primary objective of destroying essentially civilian population centers. The crucial factor is what the primary mission of a particular nuclear weapon is as stated in the pertinent war plan. Is the weapon constructed, designed, and targeted to effect destruction of a strategic factory in a large city but yet involving as few casualties as possible? Or is the weapon designed and targeted with the primary purpose being to destroy as many people as possible?
>
> When confronted with these questions, my instructors at Chanute informed me that they had access to only limited information regarding the mission or design of the weapons which they controlled. They further stated that they could not determine the exact targets of their weapons. Therefore, they could neither confirm nor deny the possible deployment of nuclear weapons against civilian population centers.
>
> This almost total lack of knowledge by experienced missile personnel plus various unclassified sources which alleged the existence of nuclear weapons programmed towards population centers plus the fact that the U.S. did employ such weapons for that express purpose during World War II, were all contributing factors in my reservations concerning missile duty.

[J.A. 138–39]

There is no indication that the Board of Inquiry failed to consider or credit this explanation. Any misunderstanding of VanderMolen's views was thus remedied. *Antonuk v. United States*, 445 F.2d 592, 597–98 (6th Cir. 1971); *Nurnberg v. Froehlke*, 489 F.2d 843, 848 (2d Cir. 1973). If VanderMolen felt that further elaboration of his views was needed, he was free to appear before the Inquiry Board and explain. That he chose not to do so was his fault, not that of the Air Force.

In their zeal to find something wrong with the discharge proceedings, so that this officer may be returned to duty, the majority violates the sound and established principle that it is not the business of the courts to run the military. I dissent.

### ON *SUA SPONTE* REQUEST FOR REHEARING *EN BANC*

Statement of TAMM, MacKINNON, ROBB and WILKEY, JJ.

In our judgment the majority opinion is wrong as a matter of law and will subvert

discipline in the armed services. For these reasons we have voted *sua sponte* to rehear this case *en banc*.