Albert H. CARTER v. The
UNITED STATES.

No. 127–66.

United States Court of Claims.

Jan. 22, 1975.

Albert H. Carter, pro se.

Leslie H. Wiesenfelder, Washington, D.C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DAVIS, NICHOLS and KASH-IWA, Judges.

## OPINION

NICHOLS, Judge.

This suit for backpay and to correct a wrongful discharge is brought pursuant to 28 U.S.C. § 1491 (as amended August 29, 1972, by Pub.L. 92–415, § 1, 86 Stat. 652). The case is now before the court for review of the opinion and findings of Trial Judge White. Though greatly aided by his opinion and findings of fact, we reach a different result from the one he recommended.

Recently, October 21, 1974, the plaintiff filed a motion alleging indigency and requesting the assignment of counsel to represent him. Counsel are a great help to the court in pay cases, and in respect to a claimant acting *pro se,* much extra work is thrown on the judges. In this case, the extra work had practically all been done, including trial, the trial judge's report, and briefing of the parties' exceptions. Plaintiff flooded the court with pleadings, motions, and briefs, prepared by himself with great diligence and ingenuity, but not calculated to make our task easier. The motion is denied as coming too late. We believe the denial is harmless to plaintiff in view of the favorable result we reach without aid of counsel.

I

The essential facts of this case are that Captain Albert H. Carter enlisted in the National Guard, September 16, 1947, and in the Air Force in 1948. He rose through the ranks to qualify for OCS (Officer Candidate School) and a commission in the Air Force Reserve in 1953, and was, prior to his transfer to Turner AFB, Georgia, rated successively higher in each evaluation report, obtaining for the period August 1958 to August 1959, two fitness reports that effectively described him as one of a half dozen best bombadier-navigators in the United States Air Force. Captain Carter was described as an extremely brilliant, dynamic and proficient officer, eminently promotable and highly recommended for various aircrew-instructor positions.

To the extent if at all that Captain Carter's financial problems had caused the Air Force any problems prior to his assignment to Turner AFB, the Air Force was apparently willing to overlook them or minimize them in view of his obviously outstanding airmanship qualities.

However, at Turner Air Force Base, his new commanders recommended his separation from the Air Force. He was "grounded" on April 21, 1960, and was notified that he was being recommended for release from the Air Force involuntarily, the endorsements of the Strategic Air Command Generals Harris and Griswold indicating that an honorable or general discharge was appropriate, based on the noncriminal nature of the financial-irresponsibility charges (and probably also upon his excellent service record and various decorations, in keeping with a long-held service policy currently expressed in 32 C.F.R. § 41.5(d)). The troubles originated in a series of curious transactions with suppliers of goods and services to plaintiff, in the civilian economy. They need not be described in detail. They led to complaints against plaintiff by his creditors to the Air Force.

These troubles led to others, as Captain Carter was one of those unfortunates who, when thwarted and angry, are unable to refrain from abusive language against all those who stand in their way.

The recommendation to release Captain Carter led to a formal Board of Inquiry under AFR 36–2, on September 28–30, 1960, at which Captain Carter was required to "show cause" why he should not be separated from the Air Force. The Board recommended Captain Carter for a discharge under other than honorable conditions, with forfeiture of readjustment pay, on the grounds that he had "demonstrated financial-irresponsibility," "had failed to demonstrate acceptable qualities of leadership required of his grade," "had made false official statements," and "had conducted himself in a manner incompatible with exemplary standards of personal conduct."

The record also indicates that the sudden reversal of personal fortunes was associated with and perhaps caused by a psychological impairment in Captain Carter so that, almost immediately after his Board of Inquiry on September 28–30, 1960, Captain Carter was involuntarily committed to a series of mental wards and hospitals, remaining almost continually confined in military facilities until his December 29, 1960, discharge date,

and thereafter in civilian facilities until some unknown time after April 6, 1961.

The outcome of the Board's actions, as reviewed by the Air Force chain of command, was that Captain Carter received an "undesirable" (dishonorable) discharge with forfeitures of readjustment pay, accumulated leave, and certain other separation benefits in place of the general or honorable discharge originally recommended, even though his presence in psychiatric wards effectively precluded his full participation in the review process.

In course of his troubles with the military, others beset him in the civilian world. He was charged with passing a bad check on Sears Roebuck and Co., on August 8, 1960. In his efforts to exculpate himself from this he committed other acts leading to a conviction in a United States District Court for forgery and perjury. He made an insanity defense which the jury rejected. The Fifth Circuit staged an *en banc* hearing to consider whether the instructions to the jury, which had been on old-fashioned *McNaughton* principles, were unduly favorable to the prosecution. The result was affirmance by an evenly divided court. Carter v. United States, 325 F.2d 697, (5 Cir. 1963). The defense would have had the circuit follow or at least approach Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). Presumably counsel believed that under the *Durham* rule Captain Carter would have been acquitted as insane. As it was, he served his time pursuant to sentence.

## II

Subsequent to his discharge, Captain Carter has had numerous other problems. Defendant reports that he is now serving a term as an habitual offender in Texas. He has tried unsuccessfully to get his discharge corrected administratively. Eventually he brought suit in this court, specifying in excess of 40 separate errors and issues in regard to his Air Force undesirable discharge. Many of the alleged errors specify statutory, regulatory, and constitutional due process violations by the Air Force.

As a consequence this court referred the case to the trial division under an order that sought to concentrate the trial division's efforts on three issues: (1) improper command influence; (2) the failure to observe proper evidentiary standards (*see* Glidden v. United States, 185 Ct.Cl. 515 (1968)); and (3) competency of Captain Carter for trial and his eligibility for a disability discharge. Unfortunately, the trial judge's findings have failed to resolve these issues for the court. We have come to believe the basis exists for our decision on broader grounds.

## III

The case is best approached by taking up first the most vulnerable aspect, legally, of the Air Force's proceedings respecting Captain Carter, the type of discharge awarded. It was one of those which inflict a stigma on the recipient. The Air Force has been reporting to would-be employers of Captain Carter that:

\* \* \* Captain Carter failed to pay just debts when due; generated disputes with creditors to avoid payment of just debts; and made false official statements regarding payment of debts. For these reasons \* \* \* [Captain Carter was discharged] under other than honorable conditions. (Letter of December 29, 1961, from J. M. Herich, Air Force Section, to L. D. Wickter, Addressograph-Multigraph Corp., Houston, Texas).

■ Such consequences with the loss of severance pay and other normal benefits demand

\* \* \* that judicial review focus with scrupulous care upon severance from the armed services with a less-than-honorable administrative discharge. Applicable regulations, and therefore the fundamentals comprising due process, must be honored both in letter and spirit. [Conn v. United States, 376 F.2d 878, 881, 180 Ct.Cl. 120, 127 (1967).]

It should go without saying, applicable statutes must be honored too. The regulation under which the plaintiff was given the discharge he was given, AFR 36–2, shifts the burden of proof to the accused in an undesirable, dishonorable, or less-than-honorable discharge proceeding.

AFR 36–2 cites various statutory bases, with no attempt to specify separate procedures based on the critical differences between 10 U.S.C. § 1163 (reserve officers) and 10 U.S.C. §§ 8781–8786 and 8791–8797 (regular officers). These statutes deal with procedures in getting rid of unsatisfactory officers.

The reserve officer provision, 10 U.S.C. § 1163, dates from 1952 and nowhere in the original statute or its legislative history (U.S.Code Cong. & Admin.News, 82d Cong., 2d Sess. (1952), at pp. 2040–2041) is there a hint of authority to conduct a proceeding in which the defendant bears the burden of proof. If a Board so recommends, an officer can be discharged under this provision, with a stigma-type discharge, 10 U.S.C. § 1163(c)(1), without a court-martial or civilian court conviction.

The regular officer provisions, 10 U.S.C. §§ 8781–8786 and 8791–8797, which would have applied to Captain Carter had he been a regular officer instead of a reserve officer, date from 1960. Their language and legislative history (U.S.Code Cong. & Admin.News, 86th Cong., 2d Sess. (1960), at pp. 2872–2873 and pp. 2880–2885) allow for the burden to be cast upon the defendant in a "show cause" proceeding in which there is an honorable or general ("under honorable conditions") discharge awarded. Retirement is authorized for those eligible, and severance pay for others.

AFR 36–2 calls for a single administrative procedure, blithely ignoring the statutory differences. Captain Carter was allowed to suffer a combination of the worst of both procedures: exposure to undesirable discharge ("other than honorable conditions") (AFR 36–2 § 4), and the burden of proof to show cause why he should not be discharged. (AFR 36–2 § 16). This burden on him was no mere form of words. It is stressed in the "Guidance Manual" supplied to members of the Board.

■ The Defense Department regulations (24 Fed.Reg. 1704, March 7, 1959) also failed to authorize the provisions of AFR 36–2. AFR 36–2, as applied to Captain Carter, was beyond the statutory authority of the Air Force. There is no reason to suppose that Congress (with its traditional concern for the rights of servicemen) meant to authorize use of a "show cause" procedure against a reserve officer who was thereby placed in jeopardy of a stigma-type discharge.

Our opinion does not raise any question concerning the use of the "show cause" procedure in any case—as with regular officers—where there is no exposure to a stigma-type discharge, or to discharge of reservists, with stigma, if guilt is proved in an administrative procedure that recognizes and observes the usual due process safeguards for the accused.

■ If the statute were construed to authorize the combination here involved, a constitutional problem would arise. The legislature cannot declare an individual guilty or presumptively guilty of a crime, or place on him the burden of going forward with the evidence. Speiser v. Randall, 357 U.S. 513, 523–524, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Following this principle in Shaw v. United States, 357 F.2d 949, 174 Ct.Cl. 899 (1966), we held that the Navy could not convict a finance officer of embezzlement on proof of a shortage in his funds which he failed to explain. In Clackum v. United States, 296 F.2d 226, 148 Ct.Cl. 404 (1960), we held that the Air Force could not inflict a stigma-type discharge on a service woman without a fair, open procedure.

Our interpretation of the statutes avoids these constitutional problems. It follows that the discharge was unlawful and must be corrected under Pub.L. 92–415, *supra,* with pecuniary consequences in remission of the forfeiture of severance or readjustment pay and any other

monetary perquisites plaintiff lost by reason of the Board recommendations.

## IV

Normally, the rule with us has been that if a stigma-type discharge is determined to have been illegal, it is held ineffective to terminate credit for active duty also, even though active duty is not performed, and full backpay is awarded until the termination of enlistment in case of an enlisted person (Glidden v. United States, *supra,* O'Callahan v. United States, 451 F.2d 1390, 196 Ct.Cl. 556 (1971); Clackum v. United States, *supra*), or until the service is lawfully terminated, in case of an officer. Borys v. United States, 201 Ct.Cl. 597, cert. denied, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973); Gearinger v. United States, 412 F.2d 862, 188 Ct.Cl. 512, (1969). Excluded from the damages are pay based on anticipated re-enlistments and promotions.

It would, also, be necessary to exclude from any backpay computation time spent in civilian or military criminal confinement, *Borys, supra,* and time spent in absence without leave is not compensible. Switkes v. United States, 480 F.2d 844, 202 Ct.Cl. 162 (1973). In *Gearinger, supra,* however, we held that a mere probability that an officer's active duty would have been terminated at some date later than the void discharge and before the court's judgment does not suffice to cut short the period in which credit is earned for constructive active duty. Defendant there was speculating about the possibility that the officer would have been passed over for promotion by selection boards, with discharge the consequence. The court's refusal to speculate about promotions is concomitant to its refusal to speculate about failure to promote. It is unavoidable that the "constructive" active duty career fashioned by the court for calculation of damage lacks realism to some degree, but it is hard on both sides in turn and is not utterly devoid of realism.

The term "constructive active duty credit" is used in Kirby v. United States, 201 Ct.Cl. 527, 535 (1973), cert. denied, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974), to identify the credit of pay for services not actually performed, that we are talking about.

We think that the normal rule for "constructive active duty credit" is inapplicable here for various reasons. In the first place, our new power to "correct" a military record under Pub.L. 92–415, *supra,* includes the power to substitute one kind of discharge for another, as of the same date. We are not confined as before to simply voiding an illegal discharge.

Secondly, erecting for plaintiff a period of "constructive active duty" would not be to plaintiff's advantage or be equitable to him because under the specific authority of 10 U.S.C. §§ 1161 and 1163, he would become exposed to a discharge under conditions other than honorable as soon as his civil conviction became final.

Third, plaintiff cannot receive backpay for periods when he was psychiatrically disabled. Manzi v. United States, 198 Ct.Cl. 489, 493 (1972). A lengthy psychiatric examination at Eglin Air Force Base resulted in findings by the primary psychiatrist who treated Captain Carter, a Captain Brennan, that Captain Carter was suffering from a "very severe character disorder" and should be separated. This finding was approved by other consulting psychiatrists (Lt. Col. Brown and Captain Small) who together with Captain Brennan formed the required Board of Officers under 10 U.S.C. § 1163. Acting as a Board, they determined that Captain Carter was not "physically disabled under the provisions of AFM 35–4" but did recommend "that action be taken for his separation from the service under the appropriate administrative regulation". This conclusion was approved by the chief medical officer, Lt. Col. Sorensen,

and forwarded to Captain Carter's commander for action along with his Board of Inquiry proceedings.

In regard to these medical proceedings, we note that 10 U.S.C. § 1163 was complied with insofar as a Board of Officers is required. Captain Brennan's specific finding of a "severe character disorder" satisfies the specifications of then 32 C.F.R. § 44.7(g)(2), (24 Fed.Reg. 1704, March 7, 1959). This specification is an approved ground for an honorable or general ("under honorable conditions") discharge for unsuitability (32 C.F.R. § 44.7(g)(2), now 32 C.F.R. § 41.-6(g)(2)).

All of the above proceedings took place contemporaneously with the review of the Board of Inquiry, the medical certificate for the psychiatric evaluation being forwarded to Captain Carter's commander about November 29, 1960. Thus, had the Air Force chosen to act solely upon this certificate, instead of the misconduct charges, Captain Carter would still have been discharged about the same time as he was.

The disability was also admitted by Captain Carter in his pleadings, using the medical findings to support his claim that he was not competent to stand trial before the Board of Inquiry.

The medical records were part of the overall record and thus did receive some high level review, although no one can now say how much.

Thus in reconstructing what would have happened if the Board of Inquiry had not met, we conclude that Captain Carter would have been discharged on about the same date as he was—with an honorable or general ("under honorable conditions") discharge. This is quite unlike the mere speculation about future career adversities that we rejected in *Gearinger.*

In light of Captain Carter's mental disability at the pertinent period, as officially determined and as asserted by himself in his petition, and in light of his recurrent troubles with the civilian law, including convictions and prolonged

confinement in prison, any fabrication of a "constructive active duty credit" for him becomes an exercise in absurdity which we are unwilling to perform ourselves or to direct the trial division to perform. If a "constructive active duty credit" were used as a starting point for damage computation, it would be subject to downward adjustment to the extent plaintiff was not at any time "ready, willing and able to perform the duties of the position * * *." *Manzi, supra,* at 493; Graves v. United States, 176 Ct.Cl. 68 (1966). Obviously he was not ready or able at the beginning of the "constructive active duty" period, being in confinement, and it would require a powerful imagination indeed to suppose the Air Force would have kept plaintiff's commission ready for him to exercise on, *e. g.,* one of his releases from prison. In such circumstances, as in *Graves, supra,* reference to the trial division for Rule 131(c) proceedings is not required.

It should be noted that apparently the Air Force standards differed as to psychiatric unfitness for duty, from those governing criminal responsibility and ability to aid in one's defense at a trial. There was, therefore, no inconsistency in finding him unfit for duty, yet fully exposed to the "show cause" proceedings based on his alleged misconduct.

The cut-off of "constructive active duty credit" when it would rest on absurd premises, is not new with this case. In Denton v. United States, 204 Ct.Cl. 188 (1974), we recently held that a reservist officer, illegally discharged during World War II, could not recover backpay, except during a short time in the demobilization period after V–J day, and not to the date of presumptive retirement or the date of judgment. It would have been unrealistic and a mere bonanza for the plaintiff in face of the wholesale discharges of reservists on demobilization after World War II. Reservists do not have a "property right" in their commissions. They may be discharged at the "pleasure of the President", 10 U.S.C. § 1162, except so far as other provisions of law limit his actions.

In *Denton* we speculated that the case of a regular might be different. It will not be necessary to decide this until the case of a regular is before us.

Therefore we hold that Captain Carter's discharge of December 29, 1960, must be corrected to show that he was discharged either "with honor" (honorable discharge) or "under honorable conditions" (general discharge), effective the same date, for "unsuitability" due to a "severe character disorder", pursuant to the medical board findings. Captain Carter's own admissions in his pleadings before this court, and 32 C.F.R. § 44.-7(g)(2), 24 Fed.Reg. 1704, March 7, 1959. Whether the corrected discharge is "honorable" or "general", we leave to the United States Air Force to determine.

We further hold that Captain Carter is entitled to all severance and separation pay and allowances and other benefits, normally provided reserve officers separated with his rank and longevity, including but not limited to readjustment pay, payment for accumulated leave, and travel pay to home of record for serviceman and dependents (at time of discharge).

Accordingly, on considering the recommended decision and findings of Trial Judge White, and the exceptions of the parties thereto, and their briefs and oral arguments, judgment is entered for the plaintiff to the extent indicated in this opinion. The Secretary of the Air Force is directed to correct the discharge of Captain Albert H. Carter, pursuant to Rule 147(c) of the rules of this court (Pub.L. 92–415, 86 Stat. 652), consistent with this opinion. The case is remanded to the trial division of this court pursuant to Rule 131(c)(2) for a determination of damages due plaintiff, based on the corrected discharge.