**Larry D. TILLEY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 331–86C.**

United States Claims Court.

Dec. 11, 1989.

---

See also 14 Cl.Ct. 451.

Mary E. Baluss, Washington, D.C., for plaintiff.

John S. Groat, Dept. of Justice, Washington, D.C., for defendant. Capt. Paul C. Clark, Dept. of Air Force, of counsel.

## OPINION

ROBINSON, Judge.

This case is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment, and on plaintiff's cross-motion for summary judgment. Plaintiff seeks compensatory and injunctive relief under Title 37 of the United States Code, entitled "Pay and Allowances of the Uniformed Services." 37 U.S.C. §§ 101 *et seq.* This court's jurisdiction arises under 28 U.S.C. § 1491 (1982). For the following reasons, defendant's motion to dismiss or, in the alternative, for summary judgment, will be denied, and plaintiff's cross-motion for summary judgment will be granted in part and denied in part.

*Background*

Plaintiff, Larry D. Tilley, enlisted in the Air Force in March 1965. His first duty assignment was as a Ballistic Missile Analyst Technician. He successfully completed his four-year assignment as an enlisted member, serving as one of a four-man crew in Titan missiles. He received an honorable discharge in 1969. Plaintiff returned to the Air Force in 1972, became a reserve officer, and achieved the rank of Captain in September 1977.

From 1972 through 1980, plaintiff performed a variety of Air Force assignments in exemplary fashion. Plaintiff was awarded the Air Force Commendation Medal (First Oak Leaf Cluster) for meritorious service from September 11, 1977, to August 10, 1980. His superiors recommended in January and July 1980 that he be promoted rapidly to the rank of Major and appointed to a regular Air Force commission.

In 1980, plaintiff was informed that he would be drafted as a nonvolunteer into

missile duty. He attempted to switch his assignment from missile duty to some other duty, but was unsuccessful. Accordingly, he reported for duty at Minot Air Force Base, North Dakota, on September 12, 1980, to await the start of the next basic missile launch officer course.

Both plaintiff's squadron commander and Colonel Wallace, Deputy Commander of Operations, discussed informally with him his efforts to be reassigned. These discussions did not prevent plaintiff from performing his assigned tasks between September and December 1980. In fact, plaintiff's evaluating officer stated that plaintiff demonstrated dedication, outstanding ability, and professionalism in his assignments during this period.

In late December 1980, plaintiff reported to the 91st Strategic Weapon CDB–72 class at Vandenberg Air Force Base, where he was named class leader. In accordance with nuclear weapon training policy and Personnel Reliability Program (PRP) certification standards, Air Force Regulation (AFR) 35–99,[1] he received detailed briefings on the destructive power of the U.S. nuclear arsenal and the effects of detonation on civilian populations. After one of these briefings, plaintiff, in compliance with the lawful order contained in AFR 35–99, ¶ 2–5,[2] spoke to Major Forrester, Chief, Minuteman Command Data Buffer Training Section, and to Captain Rowse, Personnel Reliability Program Monitor, about his concerns regarding nuclear weapons policy. He believed erroneously that the policy of the United States permitted an unprovoked preemptive strike. Plaintiff's expressed concerns precipitated a discussion with Captain Rowse and an immediate Emergency War Order (EWO) briefing by Major

Ficklin to educate plaintiff about the United States' nuclear weapon policy.

At the EWO briefing on January 5, 1981, plaintiff learned that an unprovoked first strike would be contrary to the United States' policy. He stated subsequently to Captain Rowse that he could "turn the key" in response to a valid launch order. Captain Rowse recommended that plaintiff continue his training while further interviews were conducted. Plaintiff successfully completed the academic portion of the strategic weapon course and the first missile trainer session. However, he was criticized for incomplete attendance. On January 8, 1981, plaintiff's Initial Qualification training was suspended.

Colonel Bright, Commander of the 4315th Combat Crew Training Squadron, recommended in a January 9, 1981 letter that plaintiff be permanently decertified from the PRP because of "unacceptable limitation[s] on his service." The recommendation was based upon the assumption that plaintiff would require that he personally be made aware of launch circumstances "before he could turn keys." Major General Watkins, Commander, in a January 20, 1981 letter, notified plaintiff of his permanent decertification from the PRP. The decertification letter stated that plaintiff required personal awareness and independent agreement with launch decisions. However, none of plaintiff's interview reports reflected such a demand. After decertification, plaintiff was prohibited from wearing the missile badge and his security clearance was revoked. Further, he was denied augmentation into the Regular Air Force.

On February 13, 1981, Major William Sherman, a member of the Judge Advo-

1. AFR 35–99 establishes "the requirements and responsibilities for screening, selecting, and continuously evaluating all personnel who control, handle, and have access to, nuclear weapons or nuclear weapons systems." A service member must obtain PRP certification to remain qualified for missile duty.

2. Paragraph 2–5 provides:
Self-determination of Reliability. Individuals assigned to PRP duties have the responsibility to monitor their own reliability from the safety standpoint. They should be aware of how certain problems, concerns, and circumstances may reduce their effectiveness—and even impair their performance, to the point where a safety hazzard [sic] exists. Individuals must advise supervisors of all factors (including medical or dental care) that could have an adverse impact on their performance and safety. Failure to discharge this responsibility may cast doubt on the individual's reliability and continued performance in PRP duties.

cate's staff at Minot Air Force Base Headquarters, formally notified plaintiff that discharge proceedings were being instituted against him under AFR 36–3, "Officer Personnel Administrative Discharge Procedures (Substandard Performance of Duty)."[3] He was notified on May 26, 1981, that a Board of Inquiry (BOI) would convene on July 23, 1981, to consider the pending discharge.

The entire case against plaintiff at the BOI proceeding consisted of documents related to the decertification and the opinion testimony of three superior officers who stated that they personally would not want plaintiff to serve under them. In his defense, plaintiff presented a well-documented record of 12 years of service. In addition, he testified that he was willing to execute "properly authenticated launch orders" both as of January 5, 1981, the time of the alleged moral objections, and as of the date of the BOI proceeding. He presented also as a witness his former supervisor, a Lieutenant Colonel at Kadena Air Force Base, who testified about plaintiff's personal attributes and abilities. Further, because of his extensive military background, the Lieutenant Colonel testified that concerns over the use of nuclear weapons are common among officers and enlisted personnel undergoing missile training. Plaintiff raised no objection before the BOI that the Board had been improperly constituted without reserve officers.

The BOI voted to oust plaintiff from the Air Force for those reasons set forth in the "Statement of Reasons." After the Air Force Personnel Center reviewed his case, plaintiff was honorably discharged on November 5, 1981.

Plaintiff applied to the Air Force Board for Correction of Military Records (AFBCMR) on February 1, 1984, to be reinstated on active duty at the rank of Major, to receive back pay from the date of discharge, and to remove all references to discharge from his Air Force records. On May 22, 1986—before the AFBCMR had issued its decision regarding his application—plaintiff filed his complaint in this court. On May 29, 1986, Assistant Secretary of the Air Force for Manpower, Reserve Affairs and Installations Tidal W. McCoy rejected the AFBCMR's recommendation that Capt. Tilley's discharge be voided, that Capt. Tilley be reinstated, and that his records be expunged of all references to the AFR 36–3 action.

The AFBCMR had found that Capt. Tilley's expressions of doubt concerning the offensive use of nuclear weapons did not constitute sufficient evidence of substandard performance of duty, "particularly in the light of twelve years' outstanding performance of duty." The AFBCMR noted that plaintiff was discharged on identical grounds given for plaintiff's PRP decertification, and that under AFR 35–99, "disqualification under the regulation is not cause for punitive action or adverse reflections upon an individual." Although AFR 35–99 provides that substandard conduct or diagnosis of a character behavior disorder is grounds for separation, the AFBCMR found that "no such policy is stated with respect to substandard *performance of duty*, the grounds relied upon in the case of [plaintiff]" (emphasis in original). On the basis of plaintiff's "outstanding prior records," the AFBCMR unanimously concluded that "reassignment to another career field would have been a more appropriate action." Thus, the AFBCMR deter-

---

3. In the "Statement of Reasons" accompanying the February 13, 1981 notification, the Air Force alleged that Mr. Tilley: (a) had failed "to demonstrate acceptable qualities of leadership required of an officer of his grade;" (b) had failed "to properly discharge assignments commensurate with grade and experience;" and (c) possessed a "defective attitude toward the use of nuclear missiles in support of the Air Force Mission." The basis for each of these three allegations was the same:

[D]uring the period of about 2 through 8 January, 1981, at Vandenberg Air Force Base, California, he stated that he had a moral objection to the use of nuclear weapons for offensive purposes and that he would not respond to a valid, authenticated launch order unless he knew that the use of nuclear weapons was for defensive purposes. His actions necessitated his permanent decertification under the Personnel Reliability Program and his removal from the Basic Missile Launch Officer Course.

mined that Capt. Tilley had demonstrated probable error or injustice in relation to his discharge. However, in reliance upon an unpublished "policy" of discharging officers who express moral doubts about missile duty, Assistant Secretary McCoy reversed the AFBCMR's decision as unsupported by the evidence and denied plaintiff's application in its entirety.

On July 15, 1986, plaintiff amended his complaint to allege that Assistant Secretary McCoy's denial of his application was arbitrary and capricious, unsupported by the evidence, and contrary to law and regulations. Defendant has moved to dismiss for lack of jurisdiction, and in the alternative, for summary judgment. Plaintiff filed a cross-motion for summary judgment.

## DISCUSSION

Since the court has considered matters presented outside of the pleadings, it must treat defendant's motion to dismiss as a motion for summary judgment. RUSCC 12(b). The disposition of a case on motion for summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, the court is compelled to resolve any doubt about the existence of a genuine issue of fact in favor of the nonmoving party. *Housing Corporation v. United States*, 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Ball v. United States*, 1 Cl.Ct. 180, 183 (1982). In opposing a motion for summary judgment, one must show more than a "metaphysical doubt" as to the existence of disputed material facts. *Matsushita Electric Industries Co. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In this case, neither

party, in opposing the other party's motion for summary judgment, has raised any genuine issue of material fact that would preclude summary judgment. Therefore, the court finds that the issue of liability in this case is ready for disposition on the parties' cross-motions for summary judgment. *Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1141 (Fed.Cir.1986) *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed.Cir.1987).

## I.

The initial issue is whether plaintiff's discharge is subject to judicial review. Defendant contends that Captain Tilley served "at the pleasure of the President." [4] Thus, defendant maintains that plaintiff's discharge for "substandard performance of duty" presents a nonjusticiable question because the statute and regulation under which he was discharged are drawn so that there is no meaningful standard against which to judge the agency's exercise of discretion. Defendant concludes that even though the court may believe that the Secretary's decision regarding Captain Tilley's discharge is arbitrary, capricious, or without factual support, the court has no power to review the decision.

■ Defendant's argument is without merit. AFBCMR decisions are administrative decisions. As such, they are subject to judicial review and this court can overturn them if the Secretary of the Air Force or his deputy fails to apply properly binding statutes and Air Force regulations. *Bray v. United States*, 207 Ct.Cl. 60, 80, 515 F.2d 1383, 1394–95 (1975); *Denton v. Secretary of the Air Force*, 483 F.2d 21, 25 (9th Cir.1973); *Clackum v. United States*, 148 Ct.Cl. 404, 408, 296 F.2d 226, 228 (1961). In addition, this court's review power ex-

---

4. *See* 10 U.S.C. § 1162(a) (1982), which provides in part:

(a) Subject to other provisions of this title, reserve commissioned officers may be dis-

charged at the pleasure of the President. Other Reserves may be discharged under regulations prescribed by the Secretary concerned.

tends equally to AFBCMR decisions involving either reserve officers or regular officers. *See Stewart v. United States*, 222 Ct.Cl. 42, 50–51, 611 F.2d 1356, 1361 (1979); *Carter v. United States*, 206 Ct.Cl. 61, 68–70, 509 F.2d 1150, 1153–54 (1975), *reh'g denied*, 207 Ct.Cl. 316, 518 F.2d 1199 (1976), *cert. denied*, 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86 (1976); *Pope v. United States*, 15 Cl.Ct. 218, 221–22 (1988).

■ The fundamental issue here is whether defendant must adhere to its promulgated regulations which implement the discharge power. AFR 36–3—under which plaintiff was discharged—and AFR 35–99 bind defendant just like AFR 36–2. Accordingly, this court has jurisdiction to determine whether the Air Force has violated its own regulations in discharging plaintiff for substandard performance of duty rather than reassigning him to another career field. *Bray v. United States*, 207 Ct.Cl. 60, 80, 515 F.2d 1383, 1394–95 (1975); *Denton v. Secretary of Air Force*, 483 F.2d 21, 25 (9th Cir.1973).

Defendant relies erroneously upon Presidential authority under 10 U.S.C. § 1162(a) to discharge freely reserve officers. Defendant's argument disregards the fact that the President's power to discharge is specifically "[s]ubject to other provisions of [the] title." Under 10 U.S.C. § 8012(f), the Secretary of the Air Force is authorized to "prescribe regulations to carry out his functions, powers, and duties under this title." The Secretary has prescribed AFR 36–3 and AFR 35–99. These two regulations bind the Secretary, and limit the President's exercise of discretion if he purports to act under them. *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vander-Molen v. Stetson*, 571 F.2d 617, 624 (D.C. Cir.1977).[5] Defendant has not met its burden of showing by clear and convincing evidence a legislative intent to restrict judi-

cial review under § 1162(a). *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 778, 105 S.Ct. 1620, 1626, 84 L.Ed.2d 674 (1985). Thus, the court finds that Assistant Secretary McCoy's decision was not wholly discretionary or nonjusticiable and the court may review his decision.

## II.

The pertinent Air Force regulations are Paragraphs 3–1(h), 5–5(a)(1) and (a)(3), and 5–10(b) of AFR 35–99. They provide:

"[d]isqualification under this regulation is not cause, in itself, for punitive action or adverse reflection upon an individual."

AFR 35–99, Paragraph 3–1(h).

"Punitive action will not be taken against personnel solely because of the failure to qualify or remain qualified under this program, nor will any form of adverse reflection be permitted on member's record. However, the circumstances or situations that are the cause for permanent disqualification may require punitive action or elimination from the Air Force."

AFR 35–99, Paragraph 5–5(a)(1).

". . . [d]isqualification *will not be used to justify* or to avoid appropriate proceedings under UCMJ or other existing directions governing *administrative processing or separation.*" (Emphasis added.)

AFR 35–99, Paragraph 5–5(a)(2).

"Reassignment and Retraining. A member permanently decertified from PRP duty may be an effective worker in another duty assignment where the conditions of stress are not as great or the nature of the duty so critical. When it is impractical or impossible to effectively utilize the individual in non-PRP duties within his or her AFSC, the individual must be properly retrained into a new

---

**5.** This case does not involve routine or regular personnel decisions, such as duty assignments, which are beyond the competence or jurisdiction of this court. *See Voge v. United States*, 844 F.2d 776 (Fed.Cir.1988). The discharge of plaintiff purportedly in accordance with regulations is the sort of military decision that has traditionally received judicial review. *See Denton v. Secretary of Air Force*, 483 F.2d 21, 24 (9th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974).

AFSC where he or she can be assigned to duty not covered by this regulation."
AFR 35–99, Paragraph 5–10(b).

AFR 35–99, in plain and unambiguous language, serves as a safety net to protect a service member against discharge or other punitive action when that member, whether a nuclear weapons trainee or a certified launch officer, obeys AFR 35–99's requirement to reveal any doubts about the ability to respond to a lawful or authentic order. If AFR 35–99 did not exist, no officer wanting to stay in the service would likely reveal any moral compunctions against nuclear weapon usage. In short, the objective of mission reliability and absolute assurance of unqualified response by all command personnel would be severely compromised, if not entirely defeated, by presenting the member with a "Hobson's choice" or "catch 22" situation, ensuring a punitive discharge by obedience to the specific disclosure requirement in AFR 35–99.[6]

▮ The facts show unequivocally that plaintiff's separation was impermissably based upon plaintiff's statements about his moral objections to the use of nuclear weapons for offensive purposes. The January 9, 1981 letter which initiated separation (based on involuntary separation recommendations) under AFR 36–3 was based solely upon plaintiff's decertification.

Also, at the BOI proceeding a supervising officer testified that missile disqualification was in his view tantamount to disqualification for any Air Force duty, saying that "the stigma is too great to overcome." This statement related to elimination from missile crew membership. However, the clearest indication that plaintiff's decertification precipitated his discharge is found in the reasons the BOI gave for determining that plaintiff should be discharged. It said:

[P]laintiff failed to demonstrate acceptable qualities of leadership, failed to properly discharge assignments and had a defective attitude toward the use of nuclear missiles because, during the period of January 2–8, 1981, he stated that he had a moral objection to the use of nuclear weapons for offensive purposes and that he would not respond to a valid, authenticated launch order unless he knew that the use of nuclear weapons was for defensive purposes. *His actions necessitated his permanent decertification under the Personnel Reliability Program and his removal from the basic Missile Launch Officer course.* (Emphasis added.)

Def.'s App. at 158–59.

Plaintiff's discharge under AFR 36–3 had no basis other than the PRP decertifi-

---

6. The unique role assigned to this country's nuclear weapons systems has long been recognized to require demanding and extraordinarily disciplined behavior by all military personnel assigned to such commands. Training in a nuclear command is intense. *See generally* R.E. Dougherty, "Psychological Climate of Nuclear Command", in *Managing Nuclear Operations* 407 (The Brookings Institute 1987). It is designed so that actual execution of a launch is distinguishable from a practice operation only by the authorized release and enabling codes. A commander of a nuclear weapons system does not deal in abstractions concerning the morality of nuclear weapons and their use. His function is to adhere to the standards set for him without deviation or aberrant behavior. There is no room in a missile silo, for example, for any wavering or hesitation in the launch officer's willingness "to turn the key" due to a subjective condition upon receipt of an *authentic* launch order. The circumstances simply do not permit any mental qualifications or reservations to turning the key, inherent in such statements as the launch must be "wholly retaliatory" or "initiated only after an offensive strike against the United States," or "a moral necessity," or "against a known military target rather than a civilian target," or "only with nuclear weapons having low radiation levels," and similar expressions indicating a possible refusal to act in response to an order.

Therefore, the question of whether a particular individual can meet these high standards and be retained in the nuclear weapons command must be left to the sound discretion of the military service involved, although the individual, whether during training or thereafter, may have persuasively attempted to purge himself of all doubt as to any subjective willingness to respond to an authentic launch order—an order coming from the designated commander which is in accordance with established launch procedures and requirements. However, it is quite another matter to determine that such an individual, merely because of his expression of moral compunction, necessarily must be discharged, more or less *automatically* and without recourse, for "substandard performance of duty" under AFR 36–3.

cation. Contrary to defendant's contention, plaintiff's alleged expression of moral reservation was not "conduct" requiring plaintiff's discharge. The AFBCMR knew this. On its own motion it noted that AFR 35–99 provides for potential, separately proven discharge of those whose *conduct* requires PRP decertification. There is no concomitant provision relating to separation for substandard performance of duty. Moreover, the BOI did not immediately commence proceedings to discharge plaintiff after plaintiff was charged with making the statements about his moral reservations regarding the use of nuclear weapons. To the contrary, the BOI proceeding began only after decertification and affixation of that stigma upon plaintiff. This is further evidence that the decertification, not the statements themselves, was the controlling factor in the BOI's determination to discharge plaintiff. The actions of the BOI and later of the Assistant Secretary in reversing the AFBCMR were arbitrary, capricious, and unfounded because they were grounded in considerations which should not have been taken into account. *See Hankins v. United States,* 183 Ct.Cl. 32 (1968). The reasons assigned for plaintiff's discharge are inextricably interwoven with and tied to an unlawful ground so much so that it is impossible to separate them. This alone is sufficient ground for overturning the Assistant Secretary's reversal of the AFBCMR decision. *Hankins v. United States,* 183 Ct.Cl. 32 (1968); *VanderMolen v. Stetson,* 571 F.2d 617 (D.C.Cir.1977); *Grimm v. Brown,* 449 F.2d 654 (9th Cir.1971).

Plaintiff had an outstanding service record as an officer for more than eight years. His moral reservations, if they existed prior to his involuntary assignment to missile training, did not detract from his performance. He had been given every encouragement to make the Air Force his career. In short, plaintiff's competency

and ability cannot be seriously questioned. The record does not reflect any sound or rational basis for defendant's refusal to reassign or retrain plaintiff. To discharge plaintiff in direct contravention of AFR 35–99, paragraph 5–10(b) was arbitrary and capricious.

Nor can AFR 35–99's requirements in paragraph 3–1(h), 5–5(a)(1), and 5–5(a)(2) be ignored. Collectively, they prohibit punitive action against an Air Force officer solely because of decertification. Certainly discharge of a career officer is a most severe punitive action. It was taken in this case because of plaintiff's obedience to a lawful order, not because of his failure to carry out a lawful order. The Air Force requires that the trainee advise his superiors of any moral reservations he might have about nuclear weapons usage. AFR 35–99, ¶ 2–5. Plaintiff obeyed in good faith, and in doing so, sealed his fate. There is not one scintilla of evidence that plaintiff's conduct before and during his missile training was defective, disobedient, or in any respect represented misconduct. To the contrary, the record reveals plaintiff to be an officer with an exemplary record of service and of high moral character.

Deputy Secretary McCoy's decision, which went beyond the record, cited as grounds for reversal of the AFBCMR the fact that "in recent years the Air Force has separated an average of about seven missile officers a year as a result of moral conduct; AFBCMR figures reflect a total of 49 such separations in fiscal years 1979 through 1985 inclusive." This statement apparently represents the Air Force's first recorded expression of any formal policy regarding discharge of missile officers for moral compunction.[7] However, the court stresses that under paragraph 5–5(a)(1) the Air Force is empowered to discharge a missile officer if the circumstances *otherwise* warrant this.[8]

---

**7.** If the policy has been uniformly applied and 49 such separations have occurred, the separations have been in direct contravention of AFR 35–99.

**8.** For example, if the evidence shows that an officer's statement of moral compunction was

made for the purposes of disruption and to defeat the basic mission of the program, the BOI and the AFBCMR could justify a finding of substandard performance of duty under AFR 36–3. That finding would be supported by credible evidence and this court would not then be empowered to reverse a discharge of a missile

A statement of moral reservation made in obedience to a compelling regulation during a training program, calculated to elicit exactly such statements, with no indication whatsoever of any improper purpose and not coupled with any misconduct of any kind, presents no rational basis for a determination of substandard performance of duty. While such a statement of moral compunction, particularly if not recanted convincingly during training, may and perhaps should cause decertification under AFR 35–99, but at the least it must also result in reassignment or retraining under AFR 35–99. Any other conclusion would make a meaningless sham of AFR 35–99 and its explicit prohibition against punitive action.

## CONCLUSION

This court finds that it has jurisdiction to review the final decision of the AFBCMR. Further, the BOI's decision was impermissably based upon plaintiff's decertification and was therefore a nullity. Since the BOI's decision formed the basis for Assistant Secretary McCoy's reversal of the AFBCMR, this court finds that the decision constituted clear error and must be reversed. Moreover, plaintiff's discharge in contravention of AFR 35–99, paragraph 5–10(b) was arbitrary, capricious, and constitutes an additional ground for reversal. Finally, plaintiff's discharge under AFR 36–3 was error because the evidence provides no rational basis for a finding of substandard performance of duty. Because of the court's disposition of this case, this court has not addressed plaintiff's constitutional arguments. For the foregoing reasons, defendant's motion for summary judgment is denied and plaintiff's cross motion for summary judgment is granted in part.[9] Plaintiff is entitled to be reinstated in the Air Force. No costs. The court will

officer under AFR 36–3. That is exactly the kind of military decision that is within the sound discretion of the BOI and reviewing authorities under AFR 36–3. Thus, Assistant Secretary McCoy's statement is correct that AFR 35–99 does not preclude such discharge action.

by later order schedule further proceedings.

9. Contrary to defendant's contention, plaintiff timely raised the issue of the application of AFR 35–99 before the AFBCMR. In fact, plaintiff raised the issue in two different contexts in its pleadings and in argument to the AFBCMR. The court finds that this issue was timely raised and that plaintiff has not waived its claim that defendant failed to comply with AFR 35–99.